GENERAL VALET SERVICE, INC. *v.* THOMAS
EDWARD CURLEY ET AL.

[No. 112, September Term, 1972.]

*Decided January 3, 1973.*

454

The cause was argued before MOYLAN, POWERS and GILBERT, JJ.

*Aubrey M. Daniel, III*, and *William E. McDaniel*, with whom were *Williams, Connolly & Califano, Paul R. Connolly, Robert L. Karwacki* and *Miles & Stockbridge* on the brief, for appellant.

*George W. White, Jr.*, with whom were *Samuel D. Hill* and *Buckmaster, White, Mindel & Clarke* on the brief, for appellee Charlotte E. Grahe. *Jerome Seidenman* for appellee Thomas Edward Curley. Submitted on brief by *Paul Smelkinson* for appellees James Newby and Virginia Newby and by *David S. Harris* for appellees Joseph Kraus and Carole Kraus.

POWERS, J., delivered the opinion of the Court.

Alonzo Stevenson, an employee of General Valet Service, Inc., operating on personal business a motor vehicle described as a step van, leased to General Valet by The Hertz Corporation, drove through a policeman's stop sig-

nal and a red light at Harford Road and North Avenue in Baltimore on 3 December 1967 and collided with a Baltimore City fire truck which was responding to a fire.

The collision caused the death of fireman James L. Grahe, injuries to firemen Thomas Edward Curley and Joseph Kraus, injuries and property damage to James Newby, operator of a private car which was struck by the fire engine after the first collision, injuries to Virginia Newby, his passenger, and property damage to the fire engine.

The following suits were filed, and consolidated for trial in the Superior Court of Baltimore City:

1. Thomas Edward Curley v. General Valet Service, Inc., and Alonzo Henry Stevenson, alleging negligence by Stevenson, imputed to General Valet as his employer, and direct negligence by General Valet in entrusting the vehicle to Stevenson.

2. Charlotte E. Grahe as surviving widow, as mother and next friend of James L. Grahe, Jr. and Christine J. Grahe, surviving infant children, and as Administratrix of the Estate of James L. Grahe, deceased v. Alonzo Henry Stevenson, General Valet Service, Inc., and The Hertz Corporation, alleging negligence by Stevenson, and direct negligence by General Valet and by Hertz in entrusting the vehicle to Stevenson.

3. Joseph Kraus, joined by Carole Kraus, his wife v. Alonzo Henry Stevenson, The Hertz Corporation, and General Valet Service, Inc., alleging negligence by Stevenson, imputed to General Valet and Hertz as his employers, and direct negligence by General Valet in entrusting the vehicle to Stevenson.

4. James Newby, Virginia Newby, and two subrogated insurance companies v. General Valet Service, Inc., Alonzo Henry Stevenson, and The Hertz Corporation, alleging negligence by Stevenson, imputed to General Valet and Hertz as his employers, and direct negligence by General Valet in entrusting the vehicle to Stevenson.

5. Mayor and City Council of Baltimore v. General

Valet Service, Inc., and Alonzo Henry Stevenson, alleging negligence by Stevenson, imputed to General Valet as his employer, and direct negligence by General Valet in entrusting the vehicle to Stevenson.[1]

Trial was held before Judge William J. O'Donnell and a jury, beginning 15 November 1971 and ending on 24 November 1971. When all of the plaintiffs had finished their evidence, the court granted motions for a directed verdict in favor of Hertz in all cases in which Hertz was named as a defendant. The court also granted partial directed verdicts in favor of General Valet as to imputed negligence based upon the allegation or inference that Stevenson was acting as General Valet's agent.

At the close of all of the evidence the court denied General Valet's motion for a directed verdict based on the contention that the evidence was insufficient to prove that General Valet negligently entrusted the van to Stevenson. The court granted the motions of all plaintiffs for partial directed verdicts against Stevenson as to his negligence, and instructed the jury to find against him.

The case was submitted to the jury to return a special verdict in the form of answers to questions, as provided for in Maryland Rule 560. The jury assessed damages in favor of Mrs. Grahe as surviving widow at $200,000.00 and as Administratrix at $1,761.90; in favor of the two Grahe children at $75,000.00 each; in favor of Mr. Curley at $300,000.00; in favor of Mr. and Mrs. Kraus at $8,500.00; and in favor of Mr. and Mrs. Newby and their subrogees at $3,302.50. In addition to assessing damages, the jury answered that it found against General Valet Service, Inc. Judgments nisi were entered.

Stevenson and General Valet each filed motions for judgment n.o.v. and for a new trial. All motions were heard and denied, and final judgments were entered on the verdicts.

---

1. This case was not actually tried. Damage to the fire engine was minor, and it was stipulated that this case would follow the result of the others.

General Valet appealed; Stevenson did not. Entrustment of the van to Stevenson is conceded. The single issue involved is whether that entrustment was negligent. It will be necessary to examine the law of negligent entrustment as applied to the conduct of General Valet.

In 1934 the Court of Appeals decided the first case of *Rounds v. Phillips,* 166 Md. 151, 170 A. 532. The appellant there, as administratrix of the estate of her deceased son, had sued appellees, parents of William H. Phillips, Jr., also deceased, alleging in effect that the parents had been negligent in entrusting to their son the automobile he was driving when it collided with a vehicle operated by plaintiff's decedent, resulting in the death of both. The Circuit Court for Wicomico County had sustained demurrers to the declaration below, and the appeal came up on the sufficiency of the allegations. After setting out in full the lengthy first count of the declaration, Judge W. Mitchell Digges said for the Court, at pages 160 and 161:

> "The theory upon which the plaintiff seeks to recover against the defendants is that the defendants permitted, or failed to prohibit, the use of an automobile by their minor son, which son they knew, or should have known from facts known to them, was negligent, reckless, and incompetent in the operation of automobiles.
>
> * * *
>
> In other words, the plaintiff invokes the principle involved in *Restatement of the Law of Torts,* part IV, *Negligence,* chap. 2, sec. 260: 'One who supplies directly or through a third person a chattel for the use of another whom the supplier knows, or from facts known to him should know, to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is sub-

> ject to liability for bodily harm caused thereby to them.'
>
> * * *
>
> Up to the present time this court has not had presented to it a case wherein it was necessary to decide the exact point here involved."

After thus stating the principle of law involved, the Court went on to review numerous authorities; its own earlier opinions which portended the conclusion reached, and the opinions of many courts in other jurisdictions.

As a preface to its reversal of the judgment of the lower court, the Court of Appeals said, at pages 166 and 167:

> "We have cited, perhaps at tiresome length, cases and quotations therefrom in order to demonstrate the authority upon which the quotation from the *Restatement of the Law of Torts* is founded, because, as we have stated, the question has not been heretofore directly passed upon by this court. We are of opinion, after a careful and exhaustive examination of cases, that the principle contained in the quotation from the *Restatement* is a fair and accurate statement of the rule, deduced from opinions representing the great weight of authority in this country. Of course, there are, and must be, limitations upon the application of the rule; but we find that the facts alleged in the declaration, and admitted to be true for the purpose of the decision on demurrer, are such as to create liability on the part of the defendants."

The following year saw the same litigants again before the Court of Appeals, after a trial which ended with a directed verdict for the defendants below, and judgment in their favor. In the second *Rounds v. Phillips*, 168 Md. 120, 177 A. 174, the Court recognized that although the evidence at the trial failed to prove knowledge by the

parents of all of the facts alleged concerning their son's driving, there was a series of significant facts of which there was proof at the trial. It appeared that some of these facts had been known to the parents, and that some had not been known to them. The Court said, at page 126:

> "The revocation of his license because of intoxication when driving an automobile was a fact which would naturally prompt an investigation by the defendants as to the habits of their son affecting his qualifications as the driver of a car. If such a course had been pursued, in the proper directions, the defendants would undoubtedly have learned the additional and regrettable facts, *proved in this case*, as to their son's recklessness in the operation of his car on the public highways. It is therefore inferable that the defendants, *from the facts known to them*, should have become apprised of the 'unreasonable risk of bodily harm to himself and others' involved in their son's use of an automobile without restraint."
>
> (Emphasis supplied).

The opinions of the Court of Appeals in the two *Rounds v. Phillips* cases cited above seem to have expressed the doctrine of negligent entrustment so clearly that it received no more appellate attention in Maryland for over 30 years, except for a passing ruling in 1951 in *Houlihan v. McCall*, 197 Md. 130, 78 A. 2d 661, that negligent entrustment was not a proper issue in a case when agency was admitted.

In *State of Maryland v. O'Brien*, 140 F. Supp. 306 (1956) Chief Judge Thomsen in the United States District Court for the District of Maryland applied the law of negligent entrustment as laid down by the Court of Appeals in the *Rounds v. Phillips* cases. O'Brien, employed as a truck driver by Chaney, after allegedly deviating from the course of his employment, and while

under the influence of intoxicants, negligently collided with another automobile, killing the operator. His survivors sued O'Brien and Chaney. Although the case involved other issues as well, great stress was laid on the direct and indirect knowledge of Chaney, the employer, that O'Brien, the driver to whom the truck was entrusted had, on several occasions, driven the truck while drunk or while drinking. Judge Thomsen said:

> "No quantitative line can be drawn with respect to the amount of knowledge which an owner must have of a driver's propensity for drinking to make the owner negligent in entrusting a motor vehicle to him. All of the circumstances of the case must be considered, including the type of vehicle and the area in which the vehicle is to be operated. In this case, the vehicle was a heavy dump truck, to be driven loaded with sand and gravel. The truck was to be driven in and around the City of Washington, a large metropolitan center, where traffic is exceedingly heavy. Chaney knew that O'Brien drank. He was so worried about O'Brien driving the truck at night and on week-ends after he had been drinking that he revoked permission previously given to O'Brien to keep the truck overnight and over the week-ends. There was evidence from which the jury might find that within three weeks before the accident Chaney had found O'Brien drunk in the truck parked outside a tavern in the afternoon of a working day."

In conjunction with the employer's knowledge of the driver's habit of driving while drinking, Judge Thomsen considered the evidence of the employer's negligence in permitting the employee to drive without a chauffeur's license. He said:

> "The fact that a chauffeur's license must be

renewed every two years implies that the Department of Motor Vehicles will satisfy itself every two years that the applicant continues to be qualified to operate a motor vehicle as a chauffeur. It must be presumed that the Department makes the necessary investigation and examination of such applicants. O'Brien had a Maryland operator's license but did not have a Maryland chauffeur's license; Chaney therefore violated Sec. 111 in permitting him to operate the truck."

Judge Thomsen concluded that there was evidence legally sufficient to go to the jury on the question whether Chaney was negligent in entrusting his truck to O'Brien.

The Court of Appeals considered negligent entrustment again in 1966 in *Snowhite v. State, Use of Tennant*, 243 Md. 291, 221 A. 2d 342. One Henderson was employed by Snowhite to drive gasoline and kerosene trucks, making deliveries in the Baltimore area. The evidence indicated that Henderson, with Snowhite's knowledge, regularly used Snowhite's vehicles for personal purposes, both during and after working hours. The evidence also showed that Henderson habitually stopped and drank in a bar at Pearl and Saratoga Streets, during, between, and after deliveries. The accident which gave rise to the suit happened while Henderson, intoxicated, was driving one of Snowhite's trucks. The Court said in relating the evidence:

"In 1959—about two years prior to the accident—Henderson began drinking heavily. He was convicted of reckless driving on February 17, 1959 and again on April 7, 1959, and still again on November 16, 1960. On October 25, 1961, he was convicted of failing to stop at a railroad crossing while driving a gasoline truck, thus making a total of four convictions for moving violations in approximately two and one-

half years. Snowhite knew about these convictions, which were for violations while Henderson was driving Snowhite's trucks. Snowhite also knew about an accident in which Henderson was involved for which he was not convicted. Snowhite warned Henderson that if he had any more accidents Snowhite would not be able to get any more liability insurance on the trucks.

During the two-year period prior to the accident during which Henderson was drinking heavily, he spent a substantial time every day at the Pearl Street bar. This bar was on the same street as Snowhite's office, approximately one-half a block away. Henderson drank whiskey at this bar for approximately 45 minutes to one hour between 7 and 8 a.m. (exclusive of other times), six days a week, immediately prior to driving Snowhite's trucks. Snowhite knew that Henderson frequented the bar daily during this two-year period and that Henderson drank. Indeed, Snowhite would send over to the bar or go over to the bar himself and get Henderson when he wanted Henderson to drive one of his trucks. Henderson would then come out of the bar, and thereafter, with Snowhite's knowledge that he had been drinking, he would get into one of Snowhite's trucks and drive it. Snowhite admitted that he would go over to the bar occasionally to get Henderson when he wanted Henderson to drive."

After discussing other issues in the case the Court reviewed the law of negligent entrustment and the authorities we have discussed. It went on to hold that the evidence was sufficient to support the verdict against Snowhite. Snowhite had conceded that Henderson's negligence caused the accident, and that Henderson was an habitually incompetent operator of a motor vehicle. The negligent entrustment turned on two issues of fact, 1)

whether Snowhite entrusted the truck to Henderson at all, and 2) whether Snowhite had either actual or constructive notice that Henderson was unfit as a driver. The evidence clearly supported a finding against Snowhite on both issues.

The doctrine of negligent entrustment has become well entrenched in Maryland law through the two cases of *Rounds v. Phillips, supra,* with their approval and adoption of *Restatement of the Law of Torts,* Part IV, *Negligence,* chapter 2, § 260, and *Snowhite v. State, Use of Tennant, supra,* with its approval of the slightly but not substantially revised version of the rule in 2 *Restatement, Second, Torts,* § 390. These cars, as well as *State of Maryland v. O'Brien, supra,* in which Chief Judge Thomsen of the United States District Court applied Maryland law, involved drivers whom the entrustors knew to have the habit of driving while intoxicated.

This Court has once considered the negligent entrustment doctrine, in *U-Haul Co. v. Rutherford,* 10 Md. App. 373, 270 A. 2d 490, where its applicability was urged on the narrow ground of alleged failure of the entrustor to comply with an applicable statute. U-Haul had rented a truck to a man who presented a chauffeur's license, not his own, which had been either found or stolen, and who signed the rental agreement with the name that appeared on the license. Thereafter the truck was involved in a collision while being operated negligently by the man who rented it. Appellees in that case contended that U-Haul negligently entrusted the truck to an unlicensed person because it violated what was then Code, Art. 66½, § 114 (b) which required it "to inspect the operator's or chauffeur's license of the person by whom the motor vehicle is to be operated and to compare and verify the signature thereon with the signature of such person written in the renter's presence."

After setting forth the facts as shown by the evidence we concluded that there was no legally relevant evidence from which a rational mind could infer that U-Haul did not inspect the license and did not compare and

verify the signature. We held that there was no evidence that U-Haul had violated the statute, and that the lower court erred in denying U-Haul's motion for a directed verdict.

Another general statement of the rule is found in 60A C.J.S., Motor Vehicles, § 431 (1), where it is said:

> "The owner of a motor vehicle is under a duty not to place the vehicle in the hands of a person whom he knows, or by the exercise of reasonable diligence could have known, to be an incompetent, careless, reckless, or inexperienced driver; and under what is sometimes referred to as the doctrine of negligent intrustment, the owner may be held liable for a resulting injury on the ground of negligence where he intrusts the operation of his vehicle to such a driver, when he knows, or should have known, of such characteristics on the part of the driver, in the exercise of ordinary or reasonable care or diligence, or has reasonable cause to know or believe the driver to have such characteristics. The owner's liability is determined by what he knew or should have known at the time of the intrustment."

Evidence adduced by the plaintiffs bearing upon their allegations that General Valet was negligent in entrusting the van to Stevenson came from Stanley L. Caplan, General Valet's president, William Lorenzo Washington, its plant foreman, and from Stevenson, as well as from Stevenson's record of violations at the time of his employment, as recorded in the Department of Motor Vehicles. The testimony of Stevenson and Washington was presented "live" at the trial; Caplan's was contained in two pretrial depositions. One of them was read to the jury in question and answer form, while the other, of little significance, was merely introduced as an exhibit.

In determining whether General Valet's motion for a

directed verdict was properly denied, we must consider the evidence in a light most favorable to the appellees, plaintiffs below, resolving all conflicts in their favor and assuming the truth of all the inferences which may be naturally and legitimately drawn from such evidence. When the evidence is so considered, if the plaintiffs have met their obligation of proving all the facts essential to constitute the cause of action, the motion should not be granted. *U-Haul Co. v. Rutherford, supra.*

Mr. Caplan said that General Valet Service, Inc. operated a dry cleaning, laundry and tailoring business at Fort Meade, as a concession of the post exchange. It operated one plant and five branches, all at Fort Meade. It served only military personnel or their dependents, and only through its branches. General Valet employed wives of service personnel, all of whom lived locally, to operate the branches. The plant itself had about 20 employees, some 15 of whom lived in the City of Baltimore. The number varied from time to time with employee turnover.

The company used three motor vehicles in the business, all of them leased from Hertz. One was a truck which made daily trips between Fort Meade and Fort Holabird. This arrangement was not further explained, and is not material. Another was a station wagon, which appears to have been used exclusively by William Washington, the plant foreman, for transporting himself and approximately six plant employees to and from the plant and their homes in Baltimore.

The third vehicle was the step van involved in this case. This vehicle, and its driver, a Baltimore resident, performed a double function. It was equipped with bench seats, and each morning the driver, starting from his home, made a number of stops in the east and west sections of the city, picking up some eight or nine plant employees and transporting them to the plant. The same procedure was followed in reverse at the end of the working day. During the day this van and the driver were

engaged in making pickups and deliveries between the plant and the five branches at Fort Meade.

In August, 1967, Mr. Caplan learned that the driver of his van was leaving his employment. He advertised in the newspapers for a driver, and gave his home telephone number in Pikesville for responses to the ad. He said he had a lot of responses, but the difficulty was in getting the right driver he was looking for. He said he was looking for a mature, settled person. He had about a dozen calls before Stevenson's, and rejected them all. What attracted him to Stevenson was his age, in the fifties, the fact that he was married, had what seemed to be a normal family life at home, that he had a car, that he was settled—"he seemed as though he would be the man that I would need"—"I told him to come out".

Caplan hired Stevenson on 23 August 1967, after interviewing him at the plant at Fort Meade, checking his chauffeur's license, and taking the number. He said he had his foreman ride with Stevenson around the Post to see that he knew how to handle the truck, and he handled it very well. Stevenson himself testified to a much less comprehensive test. Caplan made a trip to the Department of Motor Vehicles to check on Stevenson's chauffeur's license, and his driving record. The record was "flashed on a screen" and Caplan looked at it. While his later recollection of what was in the record was not entirely accurate, he was bound by the record as he saw it at the time. That record, which was in evidence, showed that Stevenson held a current chauffeur's license which had never been suspended or revoked, and showed the following violations:

| Date | Disposition | Description | Points |
|------|-------------|-------------|--------|
| 62-12-07 | 15.00 | Automatic signal | 1* |
| 62-12-07 | 10.00 | Fail to change name or address | |
| 64-07-02 | 2.00 | No regis card in possession | |
| 64-07-02 | L O 10.00 | Fail to keep right of center | |
| 65-04-14 | 5.00 | Fail obey traffic device | 1* |
| 66-04-27 | 15.00 | Fail stop at through highway | 1 |
| 66-04-27 | 7.00 | Improper tags | |
| 66-10-22 | 10.00 | Reckless driving | 3 |
| 66-10-01 | 5.00 | Operating on expired license | 1 |
| 67-01-10 | RW 30D | Hearing—sus abey pend clinic | |
| 67-01-09 | L O 15.00 | Fail obey traffic device | |
| 67-04-28 | | Completed driver clinic | |
| | Record end | Total Current points | 05 |

*Expired points

When being questioned about the driving record he had seen, Mr. Caplan said:

"I was satisfied that if the State had cleared him for driving, and his background, as I saw it, character, and so forth, was all right, then I hired him, and I placed no more importance on it."

\* \* \*

"I saw no reason to go into his driving record any more than that, because it's the State's responsibility to clear him on driving, not mine."

\* \* \*

"I was satisfied with the fact that he was given a clean bill of health by the State. He was sent to school, and he finished the driving course."

\* \* \*

"At first, I didn't even intend to check his record until I thought it over about this thing where he said that he had finished the school, and I wanted to satisfy myself that he was telling the truth."

Stevenson was instructed not to use the van for personal business. Caplan said it never came to his atten-

tion, until after the accident of 3 December 1967, that Stevenson had violated these instructions. He denied that on one occasion he gave permission for Stevenson to move his sister's furniture in the van.

At the time of the interview Stevenson gave a reference of prior employment as a driver, which Mr. Caplan said he verified. His recollection was that it was a large transfer company.

Washington testified that as foreman at General Valet's plant it was a part of his duties to check on other drivers in the evening to see if the truck was parked in front of their homes. He said he gave no driving test to Stevenson when he was hired. He described two occasions during Stevenson's employment of over three months when he learned that Stevenson used the van for personal purposes, against instructions. One was on a Sunday morning when he saw the van parked near a restaurant, and found the keys in it. He hid the keys over the sun visor, and left a note for Stevenson to call him at the plant. When Stevenson called, Washington told him he was not supposed to be using the van, and then told him where the keys were. Stevenson asked Washington not to report the incident to Mr. Caplan, and he agreed he would not. However, we consider that any knowledge Washington had of Stevenson's driving habits was imputed to General Valet.

On another occasion at about 8:00 or 9:00 o'clock in the evening Washington saw the van on the street. The next morning he spoke about it to Stevenson, who claimed he was just getting home, but Washington said that he did not accept that explanation.

Washington normally drove by Stevenson's house three or four evenings a week, and every time he did so he saw the van parked there. Washington also said that he used to observe Stevenson driving the vehicle around the Post, in the course of his employment, and in his opinion, Stevenson's driving ability was perfect.

Stevenson's testimony added little, if anything, to the evidence of the knowledge which General Valet had

when it hired Stevenson, or acquired thereafter, of Stevenson's driving habits, or which should have prompted further inquiry into the subject. He admitted that at the time of the accident, a Sunday, he was using the van without permission. On one occasion, he said he had obtained Mr. Caplan's permission to use the van to move a bed for his sister. He also confirmed the occasion when Washington hid the keys. He admitted that he did not own an automobile of his own.

From the authorities discussed in this opinion, it is clear that the evidence relevant to the question of negligent entrustment must be evidence which shows that General Valet knew, or from facts known to it should have known, that Stevenson, because of a habit of incompetent driving, was likely to use the van in a manner involving unreasonable risk of bodily harm to others. We consider not only what General Valet knew or had reason to know at the time Stevenson was hired, but anything it learned thereafter. An entrustment not negligent in its origin may become so if allowed to continue after the entrustor learns or has reason to learn facts which would make a continuation of the entrustment negligent. In other words, an entrustment must be subject to continuing scrutiny.

Evidence that Stevenson violated instructions on as many as three occasions by using the van for personal business, and that he lied to Caplan when he said he owned a car, is not relevant to his competence or skill as a driver, or his driving habits, and we discard it in considering the sufficiency of the evidence to go to the jury. Possession of many virtues is admirable, but lack of one or more is not evidence of the lack of another.

There was no evidence of any fact that General Valet knew or which would have been disclosed by further investigation into his driving habits, prompted by any fact it knew, at the time it hired Stevenson or at any time thereafter, which related to his habits or competence as a driver, other than the driving record viewed by Caplan at the Department of Motor Vehicles shortly after Ste-

venson was hired. We are compelled to observe that whatever impact that record may have had was progressively mitigated by his unblemished performance during his more than three months of employment. His foreman, who observed him driving daily around Fort Meade, considered his driving ability perfect. According to the evidence, Stevenson made without fault, two trips daily between Baltimore and Fort Meade, picking up and discharging eight or nine passengers.

It is significant that in the *Rounds v. Phillips* and *Snowhite* cases, as well as in *State of Maryland v. O'Brien,* there was evidence of facts which the entrustor knew, or had reason to know, which went substantially beyond the official record of motor vehicle violations by the entrustee. The present case is completely devoid of any such additional evidence. The record of the Department of Motor Vehicles stands alone.

While General Valet was not entitled to rely solely upon administrative determinations made by the Department concerning that record, it was entitled to evaluate that record in the light of the public policy of the State, as declared by the legislature. The pertinent public policy was expressed in what was then Code, Art. 66½, § 114A, which set forth Maryland's statutory point system. Under that system, points are charged against holders of operators' and chauffeurs' licenses after conviction of specified violations of the motor vehicle laws. Provision is made for suspension or revocation of licenses of persons charged with a certain number of points. A policy of reasonable tolerance is shown, in that suspension of an operator's license is imposed only after the holder is charged with 8 points, and suspension of a chauffeur's license is imposed only after the holder is charged with 15 points. Licenses are revoked when 12 points or 18 points, respectively, are charged. The statute also provides that points expire after two years.

We think General Valet was entitled to rely upon the public policy of the State that a licensee who is required to drive a motor vehicle in the course of his regular em-

ployment (and who therefore spends much more time exposed to the hazards of driving than a person not so employed) is not deemed to be unfit or unsafe to drive on the streets and highways of the State until he has been charged with 15 points. Stevenson had 5 points. Such reliance would not be justified if General Valet had or should have had knowledge of other facts, not shown in Stevenson's record of convictions, which would reflect upon his competence to drive. But here there was no evidence of such additional knowledge.

We conclude that the evidence in this case was not legally sufficient to permit the jury to decide that General Valet was negligent in entrusting the van to Stevenson. General Valet's motion for a directed verdict on this issue should have been granted.

Appellant argued that the court erred in admitting certain photographs in evidence. We need not consider the question.

*Judgments against General Valet Service, Inc. reversed.*

*Appellees to pay costs.*