CURLEY ET AL. *v.* GENERAL VALET SERVICE, INC.

[No. 5, September Term, 1973.]

*Decided November 9, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*George L. Clarke,* with whom were *George W. White, Jr.,* and *Buckmaster, White, Mindel & Clarke* on the brief, for appellants Charlotte E. Grahe et al. *Joseph I. Pines,* with whom was *Jerome J. Seidenman* on the brief, for appellant Thomas Edward Curley. *Paul Smelkinson* on the brief for appellants James Newby et ux., and *Sidney Schlachman* on the brief for appellants Joseph Kraus et ux.

*Aubrey M. Daniel, III,* with whom were *Williams, Connolly & Califano, Paul R. Connolly, William E. McDaniels, Robert L. Karwacki* and *Miles & Stockbridge* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. MCWILLIAMS, SINGLEY and DIGGES, JJ., dissent and SINGLEY, J., filed a dissenting opinion in which MCWILLIAMS and DIGGES, JJ., concur at page 267 *infra*.

On Sunday, December 3, 1967, Alonzo Stevenson, while on personal business, drove a van leased by his employer, the appellee, General Valet Service, Inc. (General Valet) through a policeman's stop signal and a red light at Harford Road and North Avenue in Baltimore. The van collided with a fire truck, killing fireman James Grahe and injuring firemen Joseph Kraus and Thomas Curley. The fire truck then struck a car owned by James Newby causing personal injury to Newby and his wife, and property damage to both vehicles. Four actions arising out of this accident were consolidated for trial in the Superior Court of Baltimore City, and resulted in jury verdicts in favor of the plaintiffs, appellants herein, against Stevenson and General Valet.[1] On appeal, the Court of Special Appeals reversed the judgments entered against General Valet.[2] *General Valet Serv. v. Curley*, 16 Md. App. 453, 298 A. 2d 190 (1973). We granted certiorari to review the question whether the Court of Special Appeals, in applying the doctrine of negligent entrustment, erred in holding that General Valet's motion for a directed verdict should have been granted on the ground that the evidence was legally insufficient to permit the jury to decide that General Valet's conceded entrustment of the van to Stevenson was negligent.

Judge Powers, in his opinion for the Court of Special Appeals, noted that the evidence introduced by the appellants at the trial bearing upon their allegations that General Valet was negligent in entrusting the van to Stevenson came from Stanley Caplan, General Valet's

---

[1.] The jury assessed damages against Stevenson and General Valet in favor of Mrs. Grahe as surviving widow at $200,000.00 and as administratrix at $1,761.90; in favor of the Grahe children at $75,000.00 each; in favor of Mr. Curley at $300,000.00; in favor of Mr. and Mrs. Kraus at $8,500.00 and in favor of Mr. and Mrs. Newby and their subrogees at $3,302.50.

[2.] Stevenson did not appeal.

president, William Washington, its plant foreman, and from Stevenson, as well as from Stevenson's record of motor vehicle violations at the time of his employment, as recorded in the Department of Motor Vehicles. The court's opinion, 16 Md. App. at 465-469, outlined the relevant evidence as follows:

"Mr. Caplan said that General Valet Service, Inc. operated a dry cleaning, laundry and tailoring business at Fort Meade, as a concession of the post exchange. It operated one plant and five branches, all at Fort Meade. It served only military personnel or their dependents, and only through its branches. General Valet employed wives of service personnel, all of whom lived locally, to operate the branches. The plant itself had about 20 employees, some 15 of whom lived in the City of Baltimore. The number varied from time to time with employee turnover.

"The company used three motor vehicles in the business, all of them leased from Hertz. One was a truck which made daily trips between Fort Meade and Fort Holabird. This arrangement was not further explained, and is not material. Another was a station wagon, which appears to have been used exclusively by William Washington, the plant foreman, for transporting himself and approximately six plant employees to and from the plant and their homes in Baltimore.

"The third vehicle was the step van involved in this case. This vehicle, and its driver, a Baltimore resident, performed a double function. It was equipped with bench seats, and each morning the driver, starting from his home, made a number of stops in the east and west sections of the city, picking up some eight or nine plant employees and transporting them to the plant. The same procedure was followed in reverse at the end of the working day. During the day this van and the driver were engaged in making pickups and deliveries between the plant and the five branches at Fort Meade.

"In August, 1967, Mr. Caplan learned that the driver of his van was leaving his employment. He advertised in the

newspapers for a driver, and gave his home telephone number in Pikesville for responses to the ad. He said he had a lot of responses, but the difficulty was in getting the right driver he was looking for. He said he was looking for a mature, settled person. He had about a dozen calls before Stevenson's, and rejected them all. What attracted him to Stevenson was his age, in the fifties, the fact that he was married, had what seemed to be a normal family life at home, that he had a car, that he was settled — 'he seemed as though he would be the man that I would need' — 'I told him to come out.'

"Caplan hired Stevenson on 23 August 1967, after interviewing him at the plant at Fort Meade, checking his chauffeur's license, and taking the number. He said he had his foreman ride with Stevenson around the Post to see that he knew how to handle the truck, and he handled it very well. Stevenson himself testified to a much less comprehensive test. Caplan made a trip to the Department of Motor Vehicles to check on Stevenson's chauffeur's license, and his driving record. The record was 'flashed on a screen' and Caplan looked at it. While his later recollection of what was in the record was not entirely accurate, he was bound by the record as he saw it at the time. That record, which was in evidence, showed that Stevenson held a current chauffeur's license which had never been suspended or revoked, and showed the following violations:

| Date | Disposition | Description | Points |
|------|-------------|-------------|--------|
| 62-12-07 | 15.00 | Automatic signal | 1* |
| 62-12-07 | 10.00 | Fail to change name or address | |
| 64-07-02 | 2.00 | No regis card in possession | |
| 64-07-02 | L 0 10.00 | Fail to keep right of center | |
| 65-04-14 | 5.00 | Fail obey traffic device | 1* |
| 66-04-27 | 15.00 | Fail stop at through highway | 1 |
| 66-04-27 | 7.00 | Improper tags | |
| 66-10-22 | 10.00 | Reckless driving | 3 |
| 66-10-01 | 5.00 | Operating on expired license | 1 |
| 67-01-10 | RW 30D | Hearing — sus abey pend clinic | |

| Date | Disposition | Description | Points |
|------|-------------|-------------|--------|
| 67-01-09 | L 0 15.00 | Fail obey traffic device | |
| 67-04-28 | | Completed driver clinic | |

Record end     Total Current points     05

*Expired points

"When being questioned about the driving record he had seen, Mr. Caplan said:

'I was satisfied that if the State had cleared him for driving, and his background, as I saw it, character and so forth, was all right, then I hired him, and I placed no more importance on it.'

\* \* \*

'I saw no reason to go into his driving record any more than that, because it's the State's responsibility to clear him on driving, not mine.'

\* \* \*

'I was satisfied with the fact that he was given a clean bill of health by the State. He was sent to school, and he finished the driving course.'

\* \* \*

'At first, I didn't even intend to check his record until I thought it over about this thing where he said that he had finished the school, and I wanted to satisfy myself that he was telling the truth.'

"Stevenson was instructed not to use the van for personal business. Caplan said it never came to his attention, until after the accident of 3 December 1967, that Stevenson had violated these instructions. He denied that on one occasion he gave permission to Stevenson to move his sister's furniture in the van.

"At the time of the interview Stevenson gave a reference of prior employment as a driver, which Mr. Caplan said he

verified. His recollection was that it was a large transfer company.

"Washington testified that as foreman at General Valet's plant it was a part of his duties to check on other drivers in the evening to see if the truck was parked in front of their homes. He said he gave no driving test to Stevenson when he was hired. He described two occasions during Stevenson's employment of over three months when he learned that Stevenson used the van for personal purposes, against instructions. One was on a Sunday morning when he saw the van parked near a restaurant, and found the keys in it. He hid the keys over the sun visor, and left a note for Stevenson to call him at the plant. When Stevenson called, Washington told him he was not supposed to be using the van, and then told him where the keys were. Stevenson asked Washington not to report the incident to Mr. Caplan, and he agreed he would not. . . .

"On another occasion at about 8:00 or 9:00 o'clock in the evening Washington saw the van on the street. The next morning he spoke about it to Stevenson, who claimed he was just getting home, but Washington said that he did not accept that explanation.

"Washington normally drove by Stevenson's house three or four evenings a week, and every time he did so he saw the van parked there. Washington also said that he used to observe Stevenson driving the vehicle around the Post, in the course of his employment, and in his opinion, Stevenson's driving ability was perfect.

"Stevenson's testimony added little, if anything, to the evidence of the knowledge which General Valet had when it hired Stevenson, or acquired thereafter, of Stevenson's driving habits, or which should have prompted further inquiry into the subject. He admitted that at the time of the accident, a Sunday, he was using the van without permission. On one occasion, he said he had obtained Mr. Caplan's permission to use the van to move a bed for his

sister. He also confirmed the occasion when Washington hid the keys. He admitted that he did not own an automobile of his own."

In its opinion reversing the judgments entered against General Valet, the Court of Special Appeals properly held that the doctrine of negligent entrustment, as recognized and applied in this State in *Rounds v. Phillips*, 166 Md. 151, 170 A. 532 (1933), *Rounds v. Phillips*, 168 Md. 120, 177 A. 174 (1935), *Snowhite v. State, Use of Tennant*, 243 Md. 291, 221 A. 2d 342 (1966), and *State, Use of Weaver v. O'Brien*, 140 F. Supp. 306 (D. Md. 1956), is based on the adoption of what is now 2 Restatement, Second, *Torts*, § 390, which reads as follows:

> "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

Based on its extensive review of the controlling Maryland cases, the Court of Special Appeals concluded that "the evidence relevant to the question of negligent entrustment must be evidence which shows that General Valet knew, or from facts known to it should have known, that Stevenson, because of a habit of incompetent driving, was likely to use the van in a manner involving unreasonable risk of bodily harm to others." 16 Md. App. at 469. In holding that there was no legally sufficient evidence of negligence to justify submission of the case to the jury, the court considered not only what General Valet knew or had reason to know at the time Stevenson was hired, but anything it learned thereafter, including Washington's knowledge, imputed to General Valet, of Stevenson's driving habits (which encompassed his personal use of the van). The court said, 16

Md. App. 469-471:

"Evidence that Stevenson violated instructions on as many as three occasions by using the van for personal business, and that he lied to Caplan when he said he owned a car, is not relevant to his competence or skill as a driver, or his driving habits, and we discard it in considering the sufficiency of the evidence to go to the jury. Possession of many virtues is admirable, but lack of one or more is not evidence of lack of another.

"There was no evidence of any fact that General Valet knew or which would have been disclosed by further investigation into his driving habits, prompted by any fact it knew, at the time it hired Stevenson or at any time thereafter, which related to his habits or competence as a driver, other than the driving record viewed by Caplan at the Department of Motor Vehicles shortly after Stevenson was hired. We are compelled to observe that whatever impact that record may have had was progressively mitigated by his unblemished performance during his more than three months of employment. His foreman, who observed him driving daily around Fort Meade, considered his driving ability perfect. According to the evidence, Stevenson made without fault, two trips daily between Baltimore and Fort Meade, picking up and discharging eight or nine passengers.

"It is significant that in the *Rounds v. Phillips* and *Snowhite* cases, as well as in *State of Maryland v. O'Brien*, there was evidence of facts which the entrustor knew, or had reason to know, which went substantially beyond the official record of motor vehicle violations by the entrustee. The present case is completely devoid of any such additional evidence. The record of the Department of Motor Vehicles stands alone.

"While General Valet was not entitled to rely solely upon administrative determinations made by the Department concerning that record, it was entitled to evaluate that record in the light of the public policy of the State, as declared by the legislature. The pertinent public policy was expressed in what was then Code, Art. 66 1/2, § 114A, which set forth Maryland's statutory point system. Under that system, points are charged against holders of operators' and chauffeurs' licenses after conviction of specified violations of the motor vehicle laws. Provision is made for suspension or revocation of licenses of persons charged with a certain number of points. A policy of reasonable tolerance is shown, in that suspension of an operator's license is imposed only after the holder is charged with 8 points, and suspension of a chauffeur's license is imposed only after the holder is charged with 15 points. Licenses are revoked when 12 points or 18 points, respectively, are charged. The statute also provides that points expire after two years.

"We think General Valet was entitled to rely upon the public policy of the State that a licensee who is required to drive a motor vehicle in the course of his regular employment (and who therefore spends much more time exposed to the hazards of driving than a person not so employed) is not deemed to be unfit or unsafe to drive on the streets and highways of the State until he has been charged with 15 points. Stevenson had 5 points. Such reliance would not be justified if General Valet had or should have had knowledge of other facts, not shown in Stevenson's record of convictions, which would reflect upon his competence to drive. But here there was no evidence of such additional knowledge."

Appellants claim that the Court of Special Appeals failed

to consider the evidence in the record which showed that Stevenson's license had actually been suspended by the Department of Motor Vehicles approximately eight months prior to his employment by General Valet, and that this suspension was known to Caplan at the time he engaged Stevenson to drive the van. Appellants draw attention to Caplan's testimony that Stevenson admitted to him "that he had had his license taken away"; that he was sent to school and "finished the driving course"; that he was given a "clean bill of health" and that "Maryland State had reinstated him." From this testimony, and from the entry on Stevenson's driving record dated January 10, 1967 — "Hearing — sus abey pend clinic" — appellants reason that the suspension was based on the then applicable provisions of Maryland Code (1957 Ed., 1967 Repl. Vol.), Article 66 1/2, § 105 (d), which authorized:

> "The Department, after due hearing, ... [to] suspend or revoke the ... chauffeur's license ... for any violation of this article by any such ... licensee ... and for any other cause or reason which, in the opinion of the Department renders the holder of any such license ... *an unfit or unsafe person to hold the same;* ... (Italics supplied) [3]

In view of the provisions of this section, appellants urge that the Court of Special Appeals was wrong when it concluded, 16 Md. App. at 470-471, that "General Valet was entitled to rely upon the public policy of the State that a licensee who is required to drive a motor vehicle, in the course of his regular employment (and who, therefore, spends much more time exposed to the hazards of driving than a person not so employed) is not deemed to be unfit or unsafe to drive on the streets and highways of the State until he has been charged with 15 points." The suspension of Stevenson's license, as appellants see it, could only have been based on the

---

**3.** The substance of this provision is now found in Code (1970 Repl. Vol.), Article 66 1/2, § 6-206.

Department's finding under § 105 (d) that Stevenson was an "unfit or unsafe person" to drive a motor vehicle, without regard to the 15-point requirement for suspension under § 114A (d).

Appellants' argument is, of course, bottomed on the premise that Stevenson's license had in fact been suspended. The trial judge found, as did the Court of Special Appeals, and as do we, that there was no legally sufficient evidence to show that Stevenson's license had ever been suspended or revoked. On the contrary, the evidence in the case, gleaned from Stevenson's driving record and not contradicted by the testimony when considered in its entirety, was that after Stevenson had accumulated 5 points, a hearing was scheduled by the Department for January 10, 1967, presumably under the provisions of § 105 (d); but the hearing was itself suspended and held in abeyance pending Stevenson's attendance at the Department's driving clinic. There is no evidence indicating that Stevenson's license had been suspended while he was attending the driving clinic, and the record shows that he completed the course on April 28, 1967. In assessing the legal sufficiency of the evidence to carry the case to the jury, we think the Court of Special Appeals properly determined that Stevenson's license had never been suspended or revoked.

Without regard to whether Stevenson's license had ever been suspended or revoked, the appellants contend that there is nothing in the law of this State which would preclude submission of the issue of negligent entrustment to the jury predicated solely on the past bad driving record of the entrustee. They point out that General Valet knew of Stevenson's ten motor vehicle violations at the time it hired him, and particularly knew that eight of those violations (five of which were moving violations) were committed within three years of his employment. This record alone, appellants argue, justified submission of the issue of negligent entrustment to the jury.

We applied the doctrine of negligent entrustment of an

automobile for the first time in *Rounds v. Phillips*, 166 Md. 151, 170 A. 532 (1933). In that case Rounds, as administratrix of her deceased son's estate, sued the parents of Phillips, the declaration alleging that the accident occurred about 5:30 a.m. on April 13, 1933 when the nineteen year old son of the defendants, while driving an automobile under their control at an excessive speed, negligently allowed the vehicle to collide with a truck driven by the plaintiff's son. The declaration alleged that the defendants knew or should have known of their son's habit and record of reckless driving, and that they were negligent in permitting him to drive a car under their control. The declaration alleged that prior to the accident the defendants' son had been frequently warned by the police to stop his reckless driving; that he had been convicted for speeding, reckless driving and driving under the influence of alcohol; that his operator's license had been revoked; and that he had seriously injured himself on one occasion during his operation of automobiles. We noted that the declaration invoked the principle of what is now 2 Restatement of Torts, § 390 (heretofore set forth), being drawn on the theory that the defendant parents were negligent in permitting their son, alleged to have been habitually reckless, negligent, and incompetent in the operation of automobiles, to be in possession of and operate such a vehicle when that habitual negligence, recklessness, and incompetence was known to them, or should have been known to them from facts of which they had knowledge. We reversed the action of the trial court in sustaining demurrers to the declaration; we said that while "there are, and must be, limitations upon the application of the rule ... the facts alleged in the declaration, and admitted to be true for the purpose of the decision on demurrer, are such as to create liability on the part of the defendants." 166 Md. at 166-167.

At the trial following our remand, the defendants were granted a directed verdict and the case was again appealed to this Court. *Rounds v. Phillips*, 168 Md. 120, 177 A. 174 (1935). There, as here, the question before us was whether

the evidence was legally sufficient to go to the jury on the issue of the negligent entrustment of the automobile. The evidence adduced at trial showed that the son became the owner of two cars, a Buick and a Ford; that three years prior to the accident, the son was injured when the automobile which he was driving at an excessive speed struck a car standing almost wholly off the road; that the son was actually and reputedly a fast and reckless driver; that his operator's license was revoked in May, 1932, after his conviction for driving an automobile while he was intoxicated; that he transferred title to the Buick and Ford, respectively, to his mother and father; that in November, 1932, the son procured a reissuance of his operator's license and thereafter resumed the use of the Buick and his habit of reckless driving, resulting a few months thereafter in the accident upon which suit was instituted. In finding this evidence legally sufficient to justify submission of the case to the jury, our predecessors noted that the defendants' knowledge of the revocation of their son's license for driving while intoxicated should have prompted their investigation into his fitness to drive, and that such an inquiry would have revealed additional facts of his recklessness. We said, 168 Md. at 126:

> ". . . admittedly both of the defendants knew of the revocation, in May, 1932, of their son's license to operate an automobile, and with that knowledge they apparently made no effort to exercise their parental right to ascertain and determine whether he could be safely intrusted with a renewal of that privilege. To be wholly indifferent to such a serious problem is hardly consistent with the responsibility involved in a parent's authority. The fact that his license was renewed, after the required insurance was provided, is not a sufficient ground for relieving the defendants of their duty to restrict their son in the use of the automobile to the extent to which such control might be necessary in the interest of his own and the public safety. The revocation of his license because of intoxication

when driving an automobile was a fact which would naturally prompt an investigation by the defendants as to the habits of their son affecting his qualifications as the driver of a car. If such a course had been pursued, in the proper directions, the defendants would undoubtedly have learned the additional and regrettable facts, proved in this case, as to their son's recklessness in the operation of his car on the public highways. It is therefore inferable that the defendants, from the facts known to them, should have become apprised of the 'unreasonable risk of bodily harm to himself and others' involved in their son's use of an automobile without restraint. . . ."

In *Snowhite v. State, Use of Tennant, supra,* we were again called upon to consider the legal sufficiency of evidence presented at trial on the issue of negligent entrustment. The appellant in that case engaged one Henderson to drive a gasoline truck in the Baltimore metropolitan area. He permitted Henderson to drive his truck on personal business. In November of 1961, he drove Snowhite's truck on personal business while intoxicated and negligently struck a car operated by the decedent of one of the appellees. Evidence showed that Henderson had been convicted of four moving violations of the motor vehicle laws between February, 1959 and October, 1961, was involved in an earlier accident, and had been drinking heavily for a period of two years prior to the accident in question. The trial judge denied Snowhite's motion for a directed verdict on the issue of negligent entrustment, and the jury found verdicts in favor of appellees. While conceding that there was ample evidence to show that Henderson was incompetent in the operation of motor vehicles, Snowhite appealed challenging the legal sufficiency of the evidence on the issue of his knowledge that Henderson was unfit to drive. That Snowhite knew of Henderson's convictions and that he frequented a bar during working hours was clearly established by the record. Snowhite had seen Henderson

after he had been drinking heavily and directed him to drive at such times, even though he admitted that he knew the danger involved in permitting a person to drive when alcohol was detectable on his breath. We noted that the gasoline truck was more difficult to drive than a passenger vehicle and that it was to be driven in areas of heavy traffic. We concluded that there was sufficient evidence, with the reasonable inferences to be drawn from that evidence, to support the verdict of the jury.

In reaching our decision in *Snowhite*, we considered *State, Use of Weaver v. O'Brien, supra,* a diversity of citizenship case applying the Maryland law of negligent entrustment. There, O'Brien, employed as a truck driver by Chaney, drove his employer's truck on personal business after drinking intoxicants and negligently struck Weaver's automobile. Weaver was killed and an action was brought on behalf of his wife and children. In finding that legally sufficient evidence of negligence was presented to the jury on the question of whether Chaney was negligent in entrusting his truck to O'Brien, the court stated:

> "No quantitative line can be drawn with respect to the amount of knowledge which an owner must have of a driver's propensity for drinking to make the owner negligent in entrusting a motor vehicle to him. All of the circumstances of the case must be considered, including the type of vehicle and the area in which the vehicle is to be operated. In this case the vehicle was a heavy dump truck . . . to be driven in and around the City of Washington, a large metropolitan center, where traffic is exceedingly heavy. Chaney knew that O'Brien drank. He was so worried about O'Brien driving the truck at night and on week-ends after he had been drinking that he revoked permission previously given to O'Brien to keep the truck overnight and over the week-ends. There was evidence from which the jury might find that within three weeks before the accident Chaney had found O'Brien drunk in

the truck parked outside a tavern in the afternoon of a working day." (140 F. Supp. at 311).

We said in *Fowler v. Smith*, 240 Md. 240, 246-247, 213 A. 2d 549 (1965) that negligence is a relative term, to be decided upon the facts of each particular case; that ordinarily it is a question of fact to be determined by the jury; that before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn; that "Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury;" that the rule requires submission of the case to the jury if there be any evidence, however slight, legally sufficient as *tending to* prove negligence, the weight and value of such evidence being left to the jury; that to meet the test of legal sufficiency, the party having the burden of proving another party guilty of negligence cannot sustain this burden "by offering a mere scintilla of evidence amounting to no more than a surmise, possibility, or conjecture that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value." To like effect, see *Richardson v. Rice*, 256 Md. 19, 259 A. 2d 251 (1969); *Williams Construction Co. v. Construction Equipment, Inc.*, 253 Md. 60, 251 A. 2d 864 (1969); *Snowhite v. State, supra.* The test of legal sufficiency, we have held, "is whether the evidence serves to prove a fact or permits an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover." *Stein v. Overlook Joint Venture*, 246 Md. 75, 81, 227 A. 2d 226, 230 (1966).

As heretofore set forth, the doctrine of negligent entrustment, recognized and applied in the cited Maryland cases, is embodied in § 390 of the Restatement, *viz.*, that one who supplies a chattel for the use of another "whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner

involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them." Comment b to the Restatement rule states, in pertinent part:

> "Thus, one who supplies a chattel for the use of another who knows its exact character and condition is not entitled to assume that the other will use it safely if the supplier knows or has reason to know that such other is likely to use it dangerously . . . or the supplier knows that the other has on other occasions so acted that the supplier should realize that the chattel is likely to be dangerously used, or that the other, though otherwise capable of using the chattel safely, has a propensity or fixed purpose to misuse it."

Since Stevenson was neither a youthful nor inexperienced driver, within the contemplation of the Restatement rule, evidence relevant to the question of negligent entrustment in this case must show, to be legally sufficient to justify submission of the issue to the jury, that General Valet knew, or from facts known to it should have known, that Stevenson, because of a habit of incompetent driving, was likely to use the van in a manner involving an unreasonable risk of bodily harm to others. Among Stevenson's ten motor vehicle violations were the following:

1.  Failure to obey an automatic signal on December 7, 1962;
2.  Failure to keep right of center on July 2, 1964;
3.  Failure to obey a traffic device on April 14, 1965;
4.  Failure to stop at a through highway on April 27, 1966;
5.  Reckless driving on October 22, 1966;
6.  Failure to obey a traffic device on January 9, 1967.

There was evidence, therefore, that Stevenson's driving record showed six moving violations of the motor vehicle laws occurring within a five-year period of the accident in this case. Three of the moving violations occurred within sixteen months of Stevenson's employment by General Valet. Four of the violations involved disregard for signs, signals, and traffic devices, the same failing which gave rise to the accident of December 3, 1967. Each of the six violations would, by its nature, be extremely hazardous if repeated by Stevenson while driving the van. The Department of Motor Vehicles was sufficiently concerned about Stevenson's competence to drive a motor vehicle that eight months prior to his employment by General Valet it scheduled a hearing to make inquiry into the matter, suspending the hearing only upon condition that Stevenson attend the Department's driving clinic. Stevenson's demonstrated propensity to disregard traffic control devices was known to Caplan when Stevenson was engaged to drive the van through heavily populated and trafficked areas of Baltimore City. Caplan acknowledged that Stevenson's past record of motor vehicle violations "was bad," and it was important to him to know that Stevenson had been guilty of ignoring an automatic signal device. General Valet nevertheless entrusted the van, seven days a week, to Stevenson with knowledge that he was driving it on his own personal business, contrary to instructions.

We think Stevenson's particular record of moving violations, known to General Valet at the time it employed him, considered in light of the type of vehicle he was driving and area in which he was known to be driving it constitutes evidence which, though meager, was legally sufficient in the circumstances of this case to permit the jury to rationally find that Stevenson's failure to heed traffic control devices was habitual and as a consequence rendered him an incompetent driver whose use of the van entrusted to him by General Valet posed an unreasonable risk of physical harm to others. See *Dinkins v. Booe*, 252 N. C. 731, 114 S.E.2d 672 (1960); *Broesche v. Bullock*, 427 S.W.2d 89 (Tex. Civ. App., 1968); *Thompson v. Havard*, 235 So. 2d 853 (Ala., 1970);

*Kemp v. Fourmy*, 265 So. 2d 651 (La., 1972); *Mayer v. Johnson*, 148 S.W.2d 454 (Tex. Civ. App., 1941). In concluding that there was evidence before the jury to permit it to find that General Valet's entrustment of the van to Stevenson was negligent, we recognize that the applicable standard set forth in the Restatement separates cases presenting isolated instances of carelessness from those evidencing reckless acts occurring with such frequency and in such a manner as to put the entrustor on notice of the danger involved. We recognize that the entrustor is only responsible for the subsequent negligent acts of the entrustee if a reasonable man could have foreseen the negligent acts; and that when the foreseeability of harm stems from past conduct, it must be conduct so repetitive as to make its recurrence foreseeable. It is with full appreciation of these principles that we have concluded that the case was properly submitted to the jury on the evidence presented at the trial. Manifestly, by our holding, we reject the notion espoused in the opinion of the Court of Special Appeals that it is the public policy of this State that a chauffeur with less than 15 points charged against his driving record is not an unsafe or unfit driver, for purposes of applying the doctrine of negligent entrustment, if there is no other evidence, known to the entrustor, which would reflect adversely upon his driving competence.

> *Judgment of the Court of Special Appeals reversed and judgment of the Superior Court of Baltimore City reinstated.*
> *Costs here and in the Court of Special Appeals to be paid by appellee.*

*Singley, J., dissenting:*

I respectfully dissent, not because I find persuasive the rationale of the opinion of the Court of Special Appeals — that the employer of a professional chauffeur is entitled to rely on the policy of the State as articulated in Code (1957,

1967 Repl. Vol.), Art. 66 1/2, § 114A (d), which subjects the license of a professional driver to suspension only after he has accumulated 15 points — but rather, because of what I view as a much more compelling reason.

It seems to me that Stevenson's record of motor vehicle violations must be considered in the light of his employment. In a period of five years, he had been charged with six moving violations, for which he had accumulated a total of four points at the time of his employment. None of these could be characterized as serious; none of them seems to have been related to an accident, and all of them, taken together in the context of his normal employment, were not enough, as I see it, to put a prospective employer on notice that Stevenson was, in the language of the majority, "an incompetent driver whose use of the van . . . posed an unreasonable risk of physical harm to others."

Assuming, for the sake of the argument, that Stevenson's driving record was sufficient to charge the employer with the duty of making further inquiry, there is nothing in the record to suggest that such an investigation would have revealed additional adverse information.

For this reason, I think General Valet's motion for a directed verdict should have been granted, and I would affirm the Court of Special Appeals in reversing the judgments entered by the Superior Court of Baltimore City.

Judge McWilliams and Judge Digges have authorized me to say that they concur in this opinion.