817 A.2d 229

**Christopher Lee TOLER**

**v.**

**MOTOR VEHICLE ADMINISTRATION.**

**No. 21, Sept. Term, 2002.**

Court of Appeals of Maryland.

Feb. 24, 2003.

Richard I. Chaifets, on brief, Columbia, for petitioner.

Dore J. Lebowitz, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Glen Burnie, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

Maryland Code, § 16–401 of the Transportation Article, requires the Motor Vehicle Administration (MVA) to maintain a point system for the suspension and revocation of drivers' licenses. Petitioner, Christopher Lee Toler, accumulated eight points within a two-year period. After a hearing, an administrative law judge for MVA suspended his license for 30 days but authorized the issuance of a restricted license that allowed him to drive for work purposes during the period of suspension. Toler contends that the MVA and, on judicial review, the Circuit Court for Prince George's County, misread the law and that he is entitled to accumulate a minimum of 16 points before his license can be suspended. He is correct.

## BACKGROUND

We are concerned here with the interplay among three statutory parts of the point system— § 16–404(a), § 16–405(a), and § 16–405(b). Section 16–404 provides for graduated sanctions upon the accumulation of points by a licensee within a two-year period. If a licensee accumulates three points, MVA must send a warning letter. § 16–404(a)(1). If a licensee accumulates five points, MVA must require attendance at a conference, except that, if the licensee holds a Class A, B, or C license and can show that he or she is a "professional driver," the licensee may not be called in for a confer-

ence until there is an accumulation of eight points. § 14–404(a)(2).

Subject to § 16–405, § 16–404(a)(3) requires MVA to suspend the license of each individual who accumulates eight points and to revoke the license of an individual who accumulates twelve points. With certain exceptions not relevant here, an initial suspension shall be for at least two but not more than thirty days; subsequent suspensions shall be for at least fifteen but not more than ninety days. § 16–404(c)(1). Subsection (c)(4) makes clear that the section does not limit MVA's authority to issue a restricted license.[1]

Section 16–405, the statute most in point in this case, provides both an exception and for some discretion on the part of MVA when a suspension or revocation arising from the accumulation of points may affect the licensee's employment. Subsection (a)—the discretionary provision—states, in relevant part, that "if the suspension or revocation of a license would affect adversely the employment or opportunity for employment of a licensee, the hearing officer may ... [d]ecline to order the suspension or revocation." Subsection (b) provides that, for purposes of § 16–404, "if a licensee is required to drive a motor vehicle in the course of his [or her] regular employment ... [s]uspension requires 16 points." Toler contends that he falls within subsection (b) and thus may not have his license suspended until he accumulates sixteen points.

Mr. Toler has had a long and continuous involvement with MVA, mostly because of speeding violations. He began collecting points shortly after receiving his license. In December, 1986, he received his first warning letter upon the accumulation of four points within a three-month period. After two speeding convictions in 1986, he was called to a conference in July, 1987, and given a reprimand. That seemed to have

---

1. Section 16–113 authorizes MVA to impose upon a licensee any restrictions that MVA determines appropriate to assure the safe driving of a motor vehicle by the licensee and, to that end, to issue a special restricted license.

little effect as, in December, 1987, he was again convicted of speeding, which resulted in a second warning letter. A third warning letter was sent in November, 1989, following a speeding conviction in August of that year. Three days prior to the issuance of that letter, he was again convicted of speeding, leading to another conference and reprimand. By reason of three additional convictions in 1990—two for speeding and one for failure to drive in the designated lane—he managed to collect eight points and was threatened with suspension. For whatever reason, however, he received only another reprimand, his third. In 1991 and 1992, he piled on two more convictions, one for speeding and one for failure to obey a traffic signal. Toler either modified his behavior or managed to elude police detection for a few years, but in 1998, having accumulated four points for speeding convictions in 1996 and 1997, he received a fourth warning letter.

The suspension that generated this case came about as a result of his collecting eight points in 1999—five upon a conviction for exceeding the speed limit by 30 miles per hour and three following a conviction for failure to reduce speed to avoid an accident. On May 1, 2001, he was informed that his license would be suspended, but, upon his request for a hearing, the suspension was held in abeyance. At the hearing, he informed the administrative law judge that he owned and operated a door and window manufacturing and installation company and that his primary role was in sales. He said that he ran "all the sales appointments for commercial sales and commercial divisions" and that he also trained and "r[a]n with" the residential sales representatives. He testified that every day he made sales calls and visited job sites and that he drove to those places, logging 100 to 200 miles a day. Toler testified that he brought in about two-thirds of the business and that if he was precluded from driving, "[i]t would be impossible for me to do what I need to do."

After taking into account that testimony and Toler's driving record, the ALJ suspended Toler's license for 30 days but directed MVA to issue him a restricted license that would permit him to drive for work purposes during the suspension

period. The ALJ explained that, with the restricted license, Toler would be able to "do everything you have to do as far as work is concerned" but that "[w]hat you can't do is drive socially for that 30–day period." Following the announcement of that decision, Toler argued, for the first time, that he fell within § 16–405(b) and, for that reason, was ineligible for a suspension. The ALJ rejected that argument.

Toler applied for and received the restricted license but also sought judicial review of the ALJ's decision, arguing that (1) the ALJ abused his discretion in making the suspension for thirty days rather than two, and (2) because he fell within the ambit of § 16–405(b)(1) and had not yet collected sixteen points, he was not eligible for any suspension. The court rejected both arguments and affirmed. We granted *certiorari* to consider the second issue, in effect whether the special exception in § 16–405(b) that requires the accumulation of sixteen points for a suspension when a licensee "is required to drive a motor vehicle in the course of his [or her] regular employment" is limited to persons whose very job is the driving of a motor vehicle or also includes persons like Toler, who simply drive as an incident to their work.

## DISCUSSION

In a direct sense, this case is moot. Toler's suspension has ended and his full driving privileges were restored. Nonetheless, if the suspension is valid, it could have a collateral consequence of some importance. If Toler's license is subsequently suspended, which, in light of his atrocious driving record, is more than a conjectural possibility, he will face a minimum period of suspension of fifteen days, rather than two days, and a maximum period of ninety days, rather than thirty days. *See* Md.Code, Transportation art., § 16–404(c)(1). Because of that collateral consequence, the issue he raises is not moot. *See Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (collateral consequences of petitioner's conviction, including consideration of the conviction in subsequent sentencing, precluded mootness); *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) (expiration

of criminal sentence did not prevent petitioner from challenging that sentence when certain collateral consequences, which were statutory and thus non-speculative, arose from his conviction); *United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954) (collateral consequences of increased penalties for subsequent convictions precluded mootness); *Adkins v. State,* 324 Md. 641, 598 A.2d 194 (1991) (summarizing the history of the collateral consequences doctrine and applying *Sibron, Carafas,* and *Morgan* to find that the petitioner's challenge to a probation violation finding was not rendered moot by the completion of his sentence; collateral consequences of a parole violation finding included increased penalties for subsequent convictions).

■ The issue is one of statutory construction, and, as we have said many times, when construing statutes "our goal is to ascertain and implement, to the extent possible, the legislative intent." *Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002). As we explained in *Witte,* "we look first to the words of the statute, on the tacit theory that the Legislature is presumed to have meant what it said and said what it meant." *Id.* We added, however, that "if the true legislative intent cannot readily be determined from the statutory language alone," we may look to other indicia of that intent, including the structure of the statute, how it relates to other laws, its legislative history, its general purpose, and the "relative rationality and legal effect of various competing constructions." *Id.* at 525–26, 801 A.2d at 165. One aspect of examining these indicia is the presumption, which itself is a rule of construction, that the Legislature "intends its enactments 'to operate together as a consistent and harmonious body of law,'" *State v. Ghajari,* 346 Md. 101, 115, 695 A.2d 143, 149 (1997) (quoting *State v. Harris,* 327 Md. 32, 39, 607 A.2d 552, 555 (1992)), such that no part of the statute is rendered meaningless or nugatory. *Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426, 428 (2002); *Montgomery County v. Buckman,* 333 Md. 516, 523–24, 636 A.2d 448, 452 (1994).

Toler looks at the language of § 16–405(b), requiring a minimum of sixteen points if the licensee "is required to drive a motor vehicle in the course of his regular employment," in a practical, but somewhat derivative, sense. He is not employed specifically to drive a motor vehicle, but his employment does require him to call on customers and visit job sites, which requires him to travel considerable distances on a near-daily basis. As a practical matter, he urges, these visits "require" him to drive in the course of his regular employment. Much the same, of course, could be said for sales people, "trouble-shooters," and repair people generally. MVA looks upon the language more restrictively: "required to drive a motor vehicle in the course of . . . regular employment" means, in its view, that driving a vehicle is not merely incidental to employment but actually constitutes the employment. MVA thus would limit the language to professional drivers—chauffeurs, truck drivers, taxi drivers, bus drivers, and the like. Standing alone, the phrase could be read reasonably either way and, for that reason, is ambiguous; it does not, of itself, clearly indicate legislative intent.

We turn, then, to some of the recognized extrinsic aids to help us divine what the Legislature had in mind when it crafted that provision. We are convinced from them that Toler's construction is the proper one.

Section 16–405(b) cannot be read in isolation. It is part of a comprehensive statute dealing with a general subject—the administration of the point system—and all parts of that statute need to be read together, harmoniously. The Legislature has provided for the suspension and revocation of drivers' licenses upon the accumulation of certain levels of points that emanate from violations of the traffic laws, but, for equivalent and countervailing public policy reasons, has allowed some flexibility for MVA not to apply those sanctions, or to apply them in a limited way, if the full sanctions would adversely affect the licensee's ability to obtain or maintain employment. It has done that in three ways: through § 16–405(a), it has given MVA discretion not to order a suspension or revocation if that would "affect adversely" the licensee's employment or

opportunity for employment; through §§ 16–404(c)(4) and 16–113, it has permitted MVA to replace a suspended or revoked license with a restricted one; and through § 16–405(b), it has limited MVA's ability to suspend or revoke a license for point accumulation to the situation in which a licensee who is "required to drive" for work has accumulated sixteen points or nineteen points, respectively.

Those provisions each have meaning and can easily be read harmoniously. As between the two relevant subsections of § 16–405, subsection (a) is obviously the broader, for it looks at whether the sanction would "affect adversely" employment, without regard to whether the licensee is required to drive in the course of employment. Employment may be adversely affected by the inability to drive in a number of ways—if the licensee is dependent on driving in order to get to and from work, regardless of whether he or she drives during the course of the employment, if driving a motor vehicle is necessary in order to carry out one or more of the non-driving duties of the licensee's employment, or if the employment actually consists of driving a motor vehicle and therefore directly depends on the ability to do so. Section 16–405(a) covers all three situations, especially when coupled with the ability of MVA to issue a restricted license during the period of suspension. Thus, even persons who fall under § 16–405(b) because they are required to drive in the course of their regular employment are also within the ambit of § 16–405(a). MVA retains discretion, even as to them, to decline to suspend or revoke the license or to issue a restricted license during a period of suspension.

Section 16–405(b) is more limited. The legislature has carved out a smaller class of licensees—those who are required to drive a motor vehicle in the course of their regular employment—and provided to them a greater cushion before sanctions are even possible. It has done so in both § 16–404(a)(2) and § 16–405(b). Section 16–404(a)(2), as noted, directs MVA to require a licensee who accumulates five points to attend a conference regarding his or her situation, but provides that a person holding a class A, B, or C license who

submits evidence acceptable to MVA that he or she is a "professional driver" may not be called to a conference until he or she accumulates eight points.[2] The designated class excused from a conference until the accumulation of eight points thus consists only of those Class A, B, or C licensees who are "professional drivers." The question is whether, and to what extent, the class afforded special treatment under § 16–405(b) was intended to be a broader one.

Supporting petitioner's argument that there *is* some difference is the fact that the Legislature used different language to describe the two classes—"professional driver" in § 16–404(a)(2) and "required to drive a motor vehicle in the course of … regular employment" in § 16–405(b). It is a common rule of statutory construction that, when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things. *See Parkinson v. State*, 14 Md. 184, 74 Am. Dec. 522 (1859); *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720 (D.Md.1996); 2A NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46.06 (6th ed. 2000) ("[T]he courts do not construe different terms within a statute to embody the same meaning.... [W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended. In like manner,

---

**2.** Sections 16–104 and 16–104.1 enumerate the various classes of licenses issued by MVA. The most restrictive is a Class M (formerly a Class E), which permits the licensee to drive a motorcycle but, unless otherwise indicated on the license, no other vehicle. A Class D license authorizes the person to drive any vehicle other than (1) a Class F tractor or Class G trailer, (2) a vehicle weighing more than 25,000 pounds, (3) a bus weighing over 10,000 pounds, and (4) a motorcycle. A Class C license allows the person to drive any vehicle a Class D licensee may drive plus a bus. A Class B license allows the person to drive all those vehicles plus vehicles weighing more than 25,000 pounds, other than a Class F tractor and a Class G trailer. A Class A license, which is the broadest in scope, allows the licensee to drive all the vehicles a Class B licensee can drive plus a Class F tractor and a Class G trailer. The license issued to ordinary drivers is the Class C license.

where the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded. The use of different terms within related statutes generally implies that different meanings were intended."); *see also Whack v. State,* 338 Md. 665, 673, 659 A.2d 1347, 1350 (1995) (stating corollary rule that "[w]hen a word susceptible of more than one meaning is repeated in the same statute or sections of a statute, it is presumed that it is used in the same sense."). That is not an immutable rule, of course, but in this instance, in light of the legislative history of the two provisions, it has significance.

The first motor vehicle law enacted in Maryland, 1904 Maryland Laws, chapter 518, required the registration of motor vehicles and sought to assure that the operators thereof were competent, but it did not provide for the licensing of drivers. It stated only, in that regard, that the owners of motor vehicles had to file with the Secretary of State a verified declaration that they were competent to drive the vehicle sought to be registered and to provide certain information regarding the vehicle. Two years later, by 1906 Maryland Laws, chapter 449, the Legislature required the registration of "chauffeurs," which it defined as persons "operating a motor vehicle as mechanic, employee or for hire, except employees of manufacturers testing uncompleted automobiles." Persons desiring to operate a motor vehicle as a chauffeur had to make special application, pay a fee, and carry a badge on their clothing.

The distinction between chauffeurs and other drivers was temporarily eliminated in 1910, when the Legislature transferred responsibility for regulating motor vehicles to the newly created position of Commissioner of Motor Vehicles and first provided for the licensing of drivers. 1910 Md. Laws, ch. 207. That law prohibited *any* person from operating a motor vehicle on State highways without either a license or the presence of someone who had a license, but it made no special provision for chauffeurs. The distinction was restored in 1912, however, when the Legislature provided that an ordinary driver's license was valid until suspended or revoked, but

declared the license of a "professional chauffeur" to be subject to annual renewal. 1912 Md. Laws, ch. 133. To that end, a "professional chauffeur" was defined as "any person operating or running a motor vehicle for another for salary or wages, and also any person operating or running a motor vehicle, whether his own or another[']s, for hire or profit." That distinction, between chauffeurs and other drivers, was carried over in the comprehensive rewriting of the motor vehicle law in 1918, which defined "chauffeur" as a person "operating a motor vehicle for hire, or as an employee of the owner thereof." 1918 Md. Laws, ch. 85. In the section on operators' licenses, the law recognized that there would be separate operators' and chauffeurs' licenses.

That definition of "chauffeur" was in effect when, in 1938, we decided *State v. Depew*, 175 Md. 274, 1 A.2d 626 (1938). The defendant, employed by the State as an auditor, was required to travel to various parts of the State to carry out his duties and, to that end, was furnished a State car. Although he had an operator's license, he did not have a chauffeur's license. While returning from an assignment in company with other auditors, he was stopped and ultimately charged with unlawfully operating a motor vehicle without a chauffeur's license. Presumably, the charge was based on his having been driving as an employee of the owner of the car. Notwithstanding the statutory definition, we concluded that Depew was not a chauffeur. We noted that the term "chauffeur" had both a restrictive and a general meaning, and we opted for the restricted one—a person "driving automobiles for salary or compensation." *Id.* at 276, 1 A.2d at 626. Following and quoting from *Des Moines Rug Cleaning Co. v. Automobile Underwriters*, 215 Iowa 246, 245 N.W. 215, 218 (Iowa 1932), we held that, as used in the statute, the term referred to a person "who is employed and paid by the owner of a motor vehicle to drive and attend the car" but did not include "an employee who receives his compensation for services rendered other than the operation of motor vehicles, *although in performing such services he may incidentally operate a motor vehicle.*" *Id.* at 277, 1 A.2d at 626 (emphasis added).

By 1959, the statutory definition of "chauffeur" had been narrowed, in rough conformance with *Depew*, to a person "who is employed for the purpose of operating a motor vehicle [or] ... who operates a motor vehicle while in use as a public or common carrier of persons or property, or for hire." Md. Code, art. 66½, § 2(a)(4) (1957 ed.). The law mandated the suspension or revocation of both an operator's and a chauffeur's license upon the licensee's conviction of certain serious motor vehicle offenses and authorized the Department of Motor Vehicles to suspend or revoke them for other reasons, including a belief that the licensee was an "unfit or unsafe person to hold the same." §§ 104, 105 (1957 ed.). No distinction was made, in that regard, between operators' and chauffeurs' licenses.

The provisions at issue here came into the law in 1959, when the Legislature first authorized the Commissioner of Motor Vehicles to create and administer a point system. 1959 Md. Laws, ch. 736. The point system brought a measure of objectivity to the suspension and revocation regime, as it was based on convictions in court rather than subjective findings by the Commissioner that the licensee was unfit or unsafe, and it also made sanctions more certain, as any conviction for a moving violation would result in one or more points and the sanctions were based on the accumulation of points within a two-year period. Presumably aware that the new system might result in more drivers facing suspension or revocation, the Legislature provided for some prior warnings in an effort to avoid that prospect. It did so by requiring the Commissioner to send a warning letter "to each licensee" upon the accumulation of three points and to call the licensee to a conference upon the accumulation of five points. The 1959 law made no distinction in either regard between operators and chauffeurs. With respect to suspension and revocation, however, it did draw a distinction. In essentially the same language now found in § 16–405(a) and (b), it gave the Commissioner discretion not to order a suspension or revocation if such action would adversely affect the employment or opportunity for employment of a licensee and provided, "in addi-

tion," that as to any licensee required to drive a motor vehicle in the course of regular employment, the notice of suspension required fifteen points rather than eight, and the notice of revocation required eighteen points rather than twelve.

The question raised, and unanswered, is why, when the Legislature already had in the law a statutory definition of "chauffeur" that long had been restricted to professional drivers, it would not have used that term to define the class entitled to the special cushion if it truly intended that class to be so limited. The 1959 law expressly referred to both operators' and chauffeurs' licenses and subjected both kinds of licensees to the new point system. Had the Legislature desired to give the special cushion only to professional drivers, as MVA argues, it could easily have done so by using the defined term "chauffeur" to describe the class, instead of resorting to the ambiguous phrase "required to drive a motor vehicle in the course of his regular employment."

That question became even more prominent when, in 1970, as part of a complete rewriting of the motor vehicle code, the Legislature first provided the separate cushion with respect to the mandatory conference. 1970 Md. Laws, ch. 534, § 6–405. Until then, all licensees were required to be called in for a conference upon the accumulation of five points, and the original bill introduced into the 1970 session retained that provision. By amendment, however, language was added to provide that holders of Class A, B, or C licenses "shall not be called in until accumulating 8 points, in the event they submit evidence acceptable to the Department that they are professional drivers."

Although in that law the Legislature eliminated the separate chauffeur's license in favor of the alphabetic categories based on the kinds of vehicles the operator desired to drive, it retained "chauffeur" as a defined term, to mean "every person who is employed for the purpose of driving a motor vehicle and every person who drives a motor vehicle while in use as a public or common carrier of persons or property for hire." *See* § 1–108 added to then Maryland Code, Article 66½. The

Legislature could, therefore, have used that term to define the group excused from a mandatory conference, and, while it chose not to do so, it did select an equivalent term—"professional drivers." By choosing that equally limited term for purposes of the conference cushion, it created a linguistic distinction between that group and the group entitled to a cushion with respect to suspension and further distanced the latter group from the limitations implicit in the defined term "chauffeur." Given the fact that the Legislature, in the same bill, also amended the initial version of the section dealing with the suspension cushion, its attention was necessarily focused on the difference in language.[3]

These distinctions, created in 1959 and 1970 as part of comprehensive statutes, have remained intact, even through the Code Revision work that produced the Transportation Article in 1977. *See* 1977 Md. Laws, ch. 14. Three times the Legislature looked at these provisions and three times it opted not to use language that was readily available and that clearly would have limited the class under § 16–405(b) to professional drivers. With this background and viewing the relevant parts of the statute as a whole, we hold that § 16–405(b) is not limited to professional drivers for whom driving constitutes their employment but includes as well those licensees who must drive in order to perform other significant duties of their employment. As MVA does not contest that Toler falls within that category, we shall reverse the judgment of the Circuit Court and remand with directions that it vacate the order of suspension entered by MVA.

JUDGMENT OF CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE ORDER OF SUSPENSION ENTERED BY MOTOR VEHI-

---

3. The first reader version of the bill set the special cushion for suspension and revocation at 15 points and 18 points, respectively, as opposed to eight points and twelve points. By amendment, the Legislature increased the cushion to 16 points and 19 points and, in doing so, amended the very sentence that contained the "required to drive" language.

CLE ADMINISTRATION; COSTS TO BE PAID BY MO-
TOR VEHICLE ADMINISTRATION.

Dissenting opinion by RAKER, J., in which HARRELL and
BATTAGLIA, JJ., join.

RAKER, J., dissenting:

The Motor Vehicle Administration rejected Toler's argu-
ment, finding that he was ineligible to claim the exception set
forth in § 16–405(b). The Circuit Court agreed with the
MVA, and affirmed. I would affirm the judgment of the
Circuit Court affirming the decision of the MVA. I would
hold that § 16–405(b) applies only to professional drivers and
does not apply to those drivers who use their vehicles merely
as a means of transportation. Toler is not a professional
driver and is not entitled to the point accumulation exception
set out in the statute.

Section 16–405(b) is ambiguous. I agree with the majority
that the language of § 16–405(b), requiring a minimum of
sixteen points if the licensee "is required to drive a motor
vehicle in the course of his regular employment," is ambigu-
ous. Nothing in the plain language reveals whether the
Legislature meant § 16–405(b) to apply solely to professional
drivers or whether the exception was applicable also to per-
sons for whom driving is an incident to employment. I
disagree with the majority's conclusion that the statute's
history reveals an intent by the Legislature to indicate the
latter.

The accumulation of eight points is the triggering event for
license suspension under normal circumstances. The statute
at issue in this case, § 16–405, designates two provisions
designed to modify this general rule. Section 16–405(a) per-
mits the MVA to modify or eliminate a suspension in situa-
tions where the suspension would "affect adversely" the licen-
see's employment. On the other hand, § 16–405(b) creates a
higher point requirement, sixteen points rather than eight, in
order to suspend the license of one who "is required to drive a

motor vehicle in the course of employment." These provisions, however, are exceptions.

I agree with the MVA's interpretation. The MVA notes that § 16–405(a) authorizes the hearing officer to exercise discretion and decline to suspend or revoke, or modify or cancel a suspension if the officer finds that the action would affect adversely the employment or opportunity for employment of a licensee. This section encompasses a very broad group. By contrast, § 16–405(b) carves out a non-discretionary, limited exception, for those licensees whose employment primarily is to drive a motor vehicle. The MVA argues that reading these sections together shows that a licensee must be more than simply "affected adversely" in employment in order to qualify for the point increase. The MVA also identifies the point conference notification provision in § 16–404(a) as further evidence of the Legislature's intent to create two distinct classes of licensees. The MVA relies on the well-accepted canon of construction that statutory provisions set out as a single scheme must be read in a manner that harmonizes the language of both and avoids nonsensical or absurd results. Toler is not a "professional driver" under § 16–404(a); his point notification is after three points and conference is five points. He does not qualify for the more forgiving scheme allowed for professional drivers. It is inconsistent to award a non-professional driver the more significant benefit of § 16–405(b). The MVA's conclusion that § 16–405(b) relates only to professional drivers maintains the exception as a distinct group, separate from all other licensees who drive incidental to their employment.

This Court has long stated as a compelling principle of statutory interpretation that "a statute is to be given a reasonable interpretation, not one that is illogical or incompatible with common sense." *W. Corr. Inst. v. Geiger*, 371 Md. 125, 142, 807 A.2d 32, 42 (2002); *Whiting–Turner v. Fitzpatrick*, 366 Md. 295, 302, 783 A.2d 667, 671 (2001); *State v. Brantner*, 360 Md. 314, 322, 758 A.2d 84, 88–89 (2000). Because driving a car is one of the activities that makes up Toler's work day, he claims that he falls within § 16–405(b). His interpretation

of the statute, accepted by the majority, violates common sense by allowing the exception to swallow the rule.

Under the majority's interpretation, there is a wide variety of people who need to drive as a part of their employment. Attorneys traveling to court, doctors with rounds at multiple hospitals, or entertainers moving between engagements, would all be entitled to acquire sixteen points before risking suspension. Under the majority's interpretation, any employee who is required to drive to work could argue that the commute is required within the course of their employment.[1] Toler does not dispute that, via a hired chauffeur or the assistance of a friend, he could perform his job without driving. At what point does the inconvenience of a suspension amount to a requirement to drive?[2] The MVA's interpretation avoids such a broadening of the exception, maintaining § 16–405(b) as a limited class of drivers who are truly "required" to drive in the course of their employment.

The MVA's interpretation also conform's with this Court's prior case law. In *State v. Depew,* 175 Md. 274, 1 A.2d 626 (1938), we refused to expand the definition of "chauffeur" to include a state auditor who used a state car to drive himself and others between assignments. The auditor was charged with driving without a chauffeur's license. We stated that the auditor did not fall within the definition of the term "chauffeur" because the operation of the motor vehicle "was purely

---

1. Perhaps the majority would not deem driving to and from work driving "in the course" of regular employment. Yet how is the commute to work in an area without access to mass transit not a "significant" duty of employment? Employees' need to get to the place of employment will always be "incident to their work."

2. Further, while licensees who drive as an incident to their employment will be allowed a sixteen point cushion before suspension, individuals whose driving needs are equally or perhaps more compelling will be excluded. Many employees may choose several methods by which to reach a work assignment. By contrast, a person who must drive a carpool or orchestrate a volunteer group may be far more tied to the use of an automobile. The majority has not provided any evidence that the Legislature intended to so disparately impact the employed and unemployed.

incidental to the purposes of his employment." *Id.* at 276, 1 A.2d at 626. Although § 16–405(b) does not equate explicitly chauffeurs with those required to drive, this was the interpretation adopted by the Court of Special Appeals in *General Valet Serv. v. Curley,* 16 Md.App. 453, 298 A.2d 190 (1973) *rev'd on other grounds, Curley v. General Valet Serv.,* 270 Md. 248, 311 A.2d 231. Discussing the application of the preceding version of § 16–405(b), the court stated:

"A policy of reasonable tolerance is shown, in that suspension of an operator's license is imposed only after the holder is charged with 8 points, and suspension of a chauffeur's license is imposed only after the holder is charged with 15 points."

*Id.* at 470, 298 A.2d at 199. This Court, while disagreeing on another issue, quoted this statement in full, and incorporated the determination into its analysis. *Curley,* 270 Md. at 257, 311 A.2d at 236. Even the dissent agreed that the statute "subjects the license of a professional driver to suspension only after he has accumulated" the higher point total. *Id.* at 267–68, 311 A.2d at 241 (Singley, J. dissenting). Despite these prior statements, the Court today holds that the heightened point requirement "is not limited to professional drivers." Maj. op. at 228.

The Majority's argument rests upon a linguistic distinction. "It is a common rule of statutory construction that, when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things." Maj. op. at 223. The majority points out that the Legislature chose not to utilize the already defined term "chauffeur," instead creating a new category of drivers. *See id.* at 227. Therefore, the majority determines that the phrase "required to drive ... in the course of his regular employment" encompasses a broader class of licensees than the class identified as chauffeurs. "Had the Legislature desired to give the special cushion only to professional drivers, as MVA argues, it could easily have done so by using the defined term 'chauffeur' to describe the class, instead of resorting to the ambiguous phrase 'required to

drive a motor vehicle in the course of his regular employment.' " *Id.*

The majority acknowledges, however, that the principle of statutory construction giving different terms different meanings, "is not an immutable rule." *Id.* at 224. In fact, the majority accepts without discussion that the terms "chauffeur" and "professional driver" are "equivalent" in meaning. *Id.* at 227–28. No explanation is apparently necessary as to why the Legislature would choose to adopt the term "professional driver" despite the existence of the already defined term "chauffeur." Such inconsistent reasoning does little to support the holding.

The interpretation of the MVA, which I embrace, allows for flexibility in the application of the point system. Prior to this case, the MVA utilized § 16–405(a) and § 16–113 to modify a suspension to account for the adverse impact the suspension might have upon a licensee's employment. The efficacy of such a system can be seen in the case *sub judice.* The ALJ exercised his discretion under § 16–405(a) and permitted Toler to drive for work purposes. There is no indication that the suspension interfered with his employment in any way. Furthermore, because he is not a professional driver, the presence of the suspension on his driving record is unlikely to adversely affect his future employment. Nonetheless, the majority would prevent the MVA from applying such discretionary provisions until Toler has accumulated a total of sixteen points within a two year period.

The majority's ruling, rather than creating a harmonious system, undermines the proper application of the point system. The result will undermine the MVA's ability to regulate and license drivers and to discharge properly its responsibility to protect the community, and will reduce the flexibility that the Legislature intended to bestow on the system. Because the result in this case is determined by statutory construction, perhaps the Legislature will act if it disagrees with the result arrived at today.

I respectfully dissent. Judge HARRELL and Judge BATTAGLIA have authorized me to state that they join in this dissenting opinion.