REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1981

September Term, 2014

_____

SUTASINEE THANA, *et al.*

v.

BOARD OF LICENSE COMMISSIONERS
FOR CHARLES COUNTY

_____

Berger,
Nazarian,
Zarnoch, Robert A.,
   (Retired, Specially Assigned),

JJ.
_____

Opinion by Zarnoch, J.
_____

Filed:  January 29, 2016

In this appeal of a decision of the Circuit Court for Charles County, a liquor licensee seeks to raise a First Amendment challenge to a "consent order" of a county liquor board that prevented the establishment from offering "go-go entertainment." In musical terms, this case, at first glance, may look like The Miracles' 1965 hit, "Going to a Go Go" meets 1984's "Footloose."[1] Ultimately, we conclude that, because of waiver and preservation problems, the appropriate tune is the Grass Roots' 1967 hit, "Things I Should Have Said."

This case revolves around go-go, but not the go-go that Smokey Robinson and the Miracles sang about in 1965. Go-go music—an offshoot of funk—originated in Washington, D.C., in the 1970s, and is characterized by a syncopated drum beat and call and response.[2]

---

[1] In the 1984 film, "Footloose," which was remade in 2011, the municipal council of the mythical town of Bomont banned dancing and rock music.

[2] In the words of Kip Lornell and Charles C. Stephenson, Jr., "Go-Go is more than music. It's a complex expression of cultural values masquerading in the guise of party music in our nation's capital." *The Beat!: Go-go Music from Washington, D. C.* 15 (rev. ed. 2009). At the hearing before the liquor board, counsel for the licensee provided the following definition of go-go music:

> Go-go is a sub-genre associated with funk that originated in the Washington, D.C. area during the mid 1960s and late 1970s. . . . . It remains primarily popular in the area as a uniquely regional musical style. A great number of bands contributed to the early revolution of the genre, but the Young Senators, Black Heat, notably, singer-guitarist Chuck Brown and The Soul Searchers are credited with having developed most of the hallmarks of the style.
> Inspired by artists such as the groups formerly mentioned, go-go is a blend of funk, rhythm and blues, and early hip-hop with a focus on lo-fi percussion instruments and funk-style jamming in place of dance tracks,

(Continued…)

In 2012, appellants Thai Seafood & Grill, Inc., trading as Thai Palace, a restaurant and bar in Waldorf, Sutasinee Thana, and Michael J. Lohman ("Thai Palace" or "licensee"), proposed and consented to restrictions on the use of promoters and on providing go-go entertainment in exchange for the ability to present live entertainment at the restaurant as reflected in a consent agreement with appellee, the Board of License Commissioners for Charles County (the "Board"). Soon after, the Charles County Sheriff's Office received information that Thai Palace was using promoters and playing go-go music. The Board brought an enforcement proceeding against Thai Palace, and after a hearing, found that it had violated the consent order. Thai Palace raised no constitutional objection at this time. The Board revoked Thai Palace's liquor license and its ability to host live entertainment.

Thai Palace petitioned the Circuit Court for Charles County to review the Board's decision, arguing, *inter alia*, for the first time that the restrictions in the second consent order violated the due process and equal protection clauses of the Fourteen Amendment to the U.S. Constitution. After a hearing held on June 23, 2014, the circuit court denied Thai Palace's petition in part in an order and memorandum opinion entered on October

(…continued)
> although some sampling is used. As such, it is primarily a dance hall music with an emphasis on live audience call and response. Go-go rhythms are also incorporated into street percussion.
>
> In technical terms, go-go's essential beat is characterized by a syncopated dotted rhythm that consists of a series of quarter and eighth notes (quarter, eighth, quarter (space/held briefly), quarter, eighth, quarter) . . . which is underscored most dramatically by the bass drum and snare drum and the hi-hat, [and] is ornamented by the other percussion instruments, especially by the congo drums, timbales and hand-held cowbells.

15, 2014.[3] Thai Palace then appealed to this Court. Now for the first time on appeal, the licensee raises a First Amendment challenge to the 2012 consent order. Thai Palace now presents the following questions for our review, which we have consolidated and rephrased:

I.  Whether this Court should dismiss the appeal as moot because the consent order at issue expired on January 12, 2015, prior to oral argument?

II.  Whether substantial evidence supported the Board's finding that Thai Palace used promoters who maintained control over the entertainment provided on site?

III.  Whether Thai Palace preserved its First Amendment argument and whether it waived its right to raise constitutional issues when it entered into the consent agreement with the Board? And, if the issue is preserved and not waived, whether a liquor board violates a licensee's free speech rights under the First Amendment of the United States Constitution and the doctrine of unconstitutional conditions when it conditions certain benefits of a liquor license upon the business not providing a certain type of music?

We hold that the case is not moot, but that the licensee's constitutional claim is not properly before us. Thus, we affirm the circuit court and the decision of the Board.

## BACKGROUND

It is helpful to provide some background from the record on the incidents that occurred prior to the proceedings at issue here and the interactions between Thai Palace, the Waldorf community, and the Board. From 2006 through 2008, police responded to numerous reports of fights, disorderly behavior, controlled-dangerous substance

---

[3] In holding against the Board in part, the court found that the Board did not make the requisite findings that a violation of a 2009 consent order occurred and found that the Board had not given proper notice of its intent to revoke Thai Palace's liquor license.

violations, and concealed weapon violations at the location of the licensee's restaurant. In 2007, these incidents resulted in 35 adult arrests and 35 juvenile arrests. That year, Thai Palace's alcoholic beverage license was revoked after it hosted entertainment that featured nudity—a violation of the Alcoholic Beverages Article, Article 2B of the Maryland Code (1957, 2011 Repl. Vol.).[4] From 2007 to 2009, after the liquor license was revoked, Thai Palace held regular go-go events hosted by promoters. During this time period, the Charles County Sheriff's Office received numerous calls reporting criminal activity, including fights, disorderly behavior, and controlled-dangerous substance violations.

On August 13, 2009, the Board held a hearing in which it considered Thai Palace's application for a Class B, beer, wine, and whiskey, liquor license.[5] Following the hearing, on November 12, 2009, the Board issued a consent order (the "first consent

[4] Parts of this provision were struck down as constitutionally overbroad. *See Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (concluding that Article 2B § 10-405 was unconstitutionally overbroad because it prohibited a substantial amount of expression that is protected by the First Amendment and was not readily susceptible to a limiting construction). In 2012, the General Assembly amended § 10-405 to bar enforcement against a licensee operating "a theater, concert hall, art center, museum, or similar establishment that is primarily devoted to the arts or theatrical performances; and . . . [t]he performances express matters of serious literary, artistic, scientific, or political value." Chapter 697, Laws of 2012.

[5] In prior proceedings before the Board, the agent for Thai Palace was Mr. Sam Thana. Starting in 2009, Mr. Thana's wife, Mrs. Sutasinee Thana, was the agent for Thai Palace and held the liquor license on its behalf. Mrs. Thana was the president of Thai Palace and owned 80% of its stock at the time of the 2009 hearing. Although there was some confusion about changes in ownership of Thai Palace during the proceedings, it appears that the appellant Thai Palace is the same corporation whose liquor license was revoked in 2007.

order") in which it imposed several conditions on the restaurant, including the condition that "there shall be no entertainment other than dinner music from either a radio and/or t.v. and that there will be no other source of entertainment without prior written approval of the Board. . ." The order provided that it "shall remain in effect until changed by the Board of License Commissioners[.]"

The first consent order remained in effect for two years without incident. In 2011, Thai Palace requested that the Board rescind the earlier consent order to allow the restaurant to once again provide live entertainment. The licensee assured the Board that it would "maintain control over arranging . . . entertainment and [would] not use an outside promoter to do so", and that it would not "offer any 'go-go' type entertainment." Following a hearing on December 11, 2011, the Board issued a second consent order on January 12, 2012, modifying the conditions imposed on the restaurant. Under the second consent order, Thai Palace was "authorized to offer additional entertainment in the licensed premises to include instrumental and acoustical music; Karaoke; DJ music and dancing[.]" However, the order restricted Thai Palace from allowing "an outside promoter to maintain control of any entertainment" and from offering any "'go-go' entertainment[.]" These provisions were obviously a response to the police involvement at the establishment from 2007 to 2009 and were designed to limit the size and unruliness of the crowds in and around Thai Palace.

The order was also to "remain in effect for a period of three years from the effective date of this order and shall act as an endorsement on the alcoholic beverage license issued to the licensees for the same three year period[.]" It further provided that,

5

"upon the expiration of three years from the effective date of this order, . . . this Order shall expire and be null and void and of no further effect." The order was signed for the Board by a Charles County assistant county attorney and by the chairman of the Board of License Commissions for Charles County, and "[a]pproved and [c]onsented to" by Sutasinee C. Thana, Michael J. Lohman, and their attorney, David J. Martinez, for Thai Palace.

A year after the issuance of the second consent order, the Charles County Sheriff's Office sent a memorandum to the Board, detailing several violations of the second consent order. On June 20, 2013, the Board issued a show cause order to Thai Palace that alleged that the restaurant hosted numerous events that were advertised by promoters and that featured go-go music.

The Board held a hearing on December 12, 2013, to review the alleged violations of the second consent order. The Board's attorney called Master Corporal Judith Thompson of the Alcohol Enforcement Unit at the Charles County Sheriff's Office. Officer Thompson provided the details of her investigation, which commenced in February 2012. She described flyers and Facebook posts that advertised purported go-go bands at the restaurant. Several of these advertisements contained names of promoters and used the words "promoted by," described in further detail below. The Board's attorney then called Officers Curtis and Chandler, also with the Charles County Sheriff's Office, both of whom worked security for Thai Palace as second jobs. They each testified that they observed go-go music playing at Thai Palace on several occasions while they were working.

6

Officer Curtis stated that she observed go-go music on two occasions while the second consent order was in effect. When asked how she knew that it was go-go music, she stated "Just from my generation, growing up. Going to school, I know what go-go music is. . . . [from] personal experience." She described go-go music as "go-go music is a — to me is people — a lot of bass, drums, talking — you know, kind of screaming somewhat into the music, very fast beat. . . . It's hard to explain." She also commented on the difference between go-go and rhythm and blues as: "Go-go has — it's pretty much the same beat. Whatever song is played, it's the same beat, same fast-paced beat. R&B is different beats, different sounds, different words, everything is different."

Officer Chandler stated that she observed go-go bands playing at Thai Palace about five or six times, but could not recall the dates. She knew that it was go-go music from personal experience, and when asked to define go-go music, Chandler stated "It's just a different sound, a different beat. I really can't explain what it is."

The Board's attorney then rested its case and counsel for Thai Palace called Mrs. Thana to testify. When questioned about promoters and how Thai Palace chose and booked entertainment, Mrs. Thana testified that she made appointments to meet with the bands and told them of the restrictions on playing go-go music.[6] Mrs. Thana stated that she made the final decision as to whom was allowed to perform at Thai Palace and that bands must receive approval from her before printing flyers. Mrs. Thana testified that

---

[6] She recounted that many of the bands felt that this policy unfairly discriminated against go-go music while allowing other music, such as Thai and Latin tunes, to be played.

7

she approved the flyers that had been introduced as exhibits, with the exception of one flyer, which she said was printed without her permission.

Mrs. Thana stated that she allowed a DJ who was scheduled to play music to book VIP tables for patrons in advance. She also approved an advertisement with the DJ's telephone number, advising patrons to call the DJ to book a VIP table. Mrs. Thana maintained that she communicated with each band manager, but, when pressed by a member of the Board, she could not remember the names of specific band managers. Regarding payment, Mrs. Thana reported that she paid in cash or made checks out to the band leader and the name of the performer. Mrs. Thana stated that she made the final decision on hiring entertainment, but that her daughter and husband would help if there was a language barrier. Samantha Thana, Mrs. Thana's daughter, testified and corroborated her mother's testimony.

Thai Palace presented its closing argument and asked the Board to credit the testimony of Mrs. Thana that she did not allow outside promoters to maintain control of the entertainment and did not allow bands to play go-go music at the restaurant. Notably, Thai Palace did not argue that the second consent order, or any potential enforcement based on it, violated its constitutional rights.

At the conclusion of the hearing, the Board found that Thai Palace violated the second consent order and voted to revoke all consent. In a decision and order dated January 9, 2014, the Board concluded:

> That from February 2012 through April 20, 2013, Sutasinee Thana, Michael James Lohman, Thai Seafood and Grill, Inc., or their agents and employees, allowed numerous outside promoters to maintain control of the

8

entertainment at Thai Palace in violation of the modified Consent Order dated January 12, 2012; and . . .

That from February 2012 through April 20, 2013, Sutasinee Thana, Michael James Lohman, Thai Seafood and Grill, Inc., or their agents and employees, hosted numerous events that included "go go" entertainment in violation of the modified Consent Order dated January 12, 2012.

The order revoked the first and second consent orders as well as Thai Palace's Class-B alcoholic beverage license.

On February 6, 2014, Thai Palace petitioned for judicial review of the Board's decision pursuant to Maryland Rule 7-201 *et seq*. Before the circuit court, the licensee argued: 1) that the findings by the Board that Thai Palace had allowed promoters to maintain control of entertainment and play go-go music were not supported by substantial evidence; 2) that the restriction on having go-go entertainment placed on its license was a violation of Article 24 of the Maryland Declaration of Rights and the Equal Protection and Due Process Clauses of the 14th Amendment to the United States Constitution; and 3) that the decision of the Board to revoke the alcoholic beverage license for violations of the 2012 consent order was beyond the power of the Board because there were no allegations that Thai Palace had violated the alcoholic beverage laws or regulations of Charles County, nor was there an allegation that Thai Palace had violated any other provision of Article 2B for which revocation of a license is a penalty.

The Board countered that its findings were supported by substantial evidence; that Thai Palace was barred from contesting the constitutionality of the consent order because it had agreed to the restrictions on go-go entertainment; and that the Board had authority

to revoke Thai Palace's license because the license was predicated on compliance with the second consent order.

At a hearing held before the circuit court on June 23, 2014, Thai Palace did not expand on its constitutional claims. It maintained its argument that the language of the second consent order violated equal protection because "it was discriminatory as opposed to all types of music" and due process "because there was no ascertainable standard for [the music's] inclusion or exclusion, and was therefore unconstitutionally vague."

The circuit court issued an order and memorandum opinion on October 16, 2014, in which it concluded that substantial evidence was presented at the hearing to sustain the Board's findings. The court agreed with the Board that Thai Palace waived any constitutional challenge to the prohibition on go-go music because Thai Palace proposed and consented to the restriction and would have had to appeal the restriction at the time it was imposed to obtain judicial review. The court did, however, hold that the Board was not authorized to revoke the liquor license, because it was not conditioned on Thai Palace's compliance with the terms of the second consent order and the hearing did not otherwise meet the procedural requirements for revoking a liquor license under Article 2B § 10-403(a)(1). The court remanded the case to the Board for further proceedings to determine whether the liquor license should be revoked. Thai Palace filed its appeal to

10

this Court on November 13, 2014.[7]  The Board did not cross-appeal the circuit court's order.

## DISCUSSION

### I.    Mootness

As an initial matter, the Board argues that this appeal should be dismissed as moot because the second consent order expired by its own terms on January 12, 2015, three years from the date of its issue.  Thai Palace responds that this appeal is not moot because it could have collateral estoppel implications for its federal case, currently on appeal in the U.S. Court of Appeals for the Fourth Circuit.  Thai Palace also argues that, if affirmed, the Board could consider the violation in subsequent proceedings to impose greater penalties.

"A case is moot when there is no longer any existing controversy between the parties at the time that the case is before the court, or when the court can no longer

---

[7] In addition to the state court proceedings here, on November 5, 2014, Thai Palace filed a complaint in the U.S. District Court for the District of Maryland, alleging that the restriction on go-go entertainment in the second consent order violated its First Amendment rights to free speech and requested a declaratory judgment finding that the condition and the revocation of the consent order based upon the Board's finding ran afoul of the First Amendment. *Thana v. Bd. of License Com'rs for Charles County, Md.*, 104 F. Supp. 3d 711 (D. Md. 2015).  The district court, in a memorandum opinion issued on May 14, 2015, granted the Board's motion to dismiss for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine, which precludes federal appellate jurisdiction over state court judgments.  *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983) ("[A] United States District Court has no authority to review final judgments of a state court in judicial proceedings. Review of such judgments may be had only in [the Supreme] Court").  Thai Palace appealed this decision to the U.S. Court of Appeals for the Fourth Circuit, which has not scheduled oral argument as of the date of this decision.

11

fashion an effective remedy." *Green v. Nassif*, 401 Md. 649, 654 (2007) (quoting *In re Kaela C.*, 394 Md. 432, 452 (2006)) (Internal quotation marks omitted). "Where, however, it seems apparent that a party may suffer collateral consequences from a trial court's judgment [or administrative decision], the case is not moot." *In re Kaela C.*, 394 Md. at 453 (citing *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 219 (2003)); *see Toler*, 373 Md. at 219 (holding that the potential for enhanced penalties for future violations kept a case from becoming moot); *see also Case of Seila's Liquor License*, 190 A. 203, 205 (Pa. Super. Ct. 1937) (The collateral consequences, in the form of increased penalties, "of a violation of the liquor laws prevent the questions [on appeal] from becoming moot at the expiration of the term of a license").

"'Unlike the Article III constitutional constraints on the federal courts, . . . [Maryland's] mootness doctrine is based entirely on prudential considerations' that do not constitutionally bar us from reaching the merits of a moot action." *Comptroller of the Treasury v. Zorzit*, 221 Md. App. 274, 291-92 (2015) (quoting *Carroll Cnty. Ethics Comm'n v. Lennon*, 119 Md. App. 49, 57 (1998)). However, even under the more stringent federal case or controversy requirement, a licensee who asserts an intent to continue to operate under the terms of a valid license will be deemed to have satisfied the requirement for setting forth an existing controversy between the parties. *See Clark v. City of Lakewood*, 259 F.3d 996, 1012 (9th Cir. 2001) (holding that case was not moot where adult business stated intention to reopen his business if ordinance were enjoined); *Dolls, Inc. v. City of Coralville, Iowa*, 425 F. Supp. 2d 958, 986 (S.D. Iowa 2006) (Case not moot where adult business currently asserted an intent to reopen, even though it had

not applied for, nor been denied zoning permit); *cf. City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001) (holding that no controversy existed where party had exited the adult business and asserted no plan to reenter).

In the present case if the Board prevails, it could use the existence of the violations against Thai Palace in future proceedings. At oral argument, Thai Palace expressed its intention to petition the Board again to allow the restaurant to provide live entertainment. Therefore, because the outcome of these proceedings will affect the licensee's future treatment by the Board, we hold that the case is not moot, and we deny the Board's motion to dismiss.

## II.    Restriction on the Use of Promoters

A key issue here is whether substantial evidence existed to support the decision of the Board. Thai Palace argues that substantial evidence did not exist to support the Board's findings that Thai Palace violated the second consent order by allowing promoters to maintain control of the entertainment. Thai Palace does not contest the sufficiency of evidence to support a finding that it provided go-go entertainment; however, it does challenge the constitutionality of the restrictions on go-go entertainment in the second consent order. We discuss these arguments below.

> Our review of the Board's decision is the same as that of the circuit court:
>
> [T]he action of the local licensing board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the petitioner to show that the decision complained of was against the public interest and that the local licensing board's discretion in rendering its decision was not honestly and fairly exercised, or that such decision was arbitrary, or procured by fraud, or unsupported by any substantial evidence, or was unreasonable, or that such decision was beyond the powers of the

13

local licensing board, and was illegal. The case shall be heard by the court without the intervention of a jury.

Art. 2B, § 16-101(e)(1)(i). Thus, our review of the decision of the Board is similar to our review of decisions of other administrative agencies—in short, if the Board's decision was supported by substantial evidence, and if it committed no error of law, we must affirm. *Paek v. Prince George's County Bd. of License Com'rs*, 381 Md. 583, 590 (2004).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blackburn v. Board of Liquor License Comm'rs for Baltimore City*, 130 Md. App. 614, 634 (2000) (quoting *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512 (1973)). Reviewing courts assume the capability of the board members "who are familiar with the matter in dispute and informed by training and experience to pass upon the questions of fact presented to them"; therefore, the courts will "not substitute their own judgments for the findings of administrative officials" *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 568 (2014) (quoting *Coddington v. Helbig*, 195 Md. 330, 337 (1950)).

The second consent order states that Thai Palace "shall not allow an outside promoter to maintain control of any entertainment." An "outside promoter" is a party unaffiliated with Thai Palace who encourages or promotes the entertainment. "Promoter," *Black's Law Dictionary* (10th ed. 2014). The phrase, "maintain control" means to "exercise power or influence over" something. "Control," *Black's Law Dictionary* (10th ed. 2014). Accordingly, in this context, the second consent order

14

prohibits third parties from influencing or exercising power over the advertising, marketing, and performing of entertainment at Thai Palace.

At the December 12, 2013 hearing, Officer Thompson testified that she observed advertisements that represented that the entertainment was organized by a third party promoter:

> [THOMPSON]: I had received information from our intelligence unit in reference to an event that was scheduled for February 4th, and the advertisement . . . basically that said that they were going to have a performance and that there were several names of promoters that were on the advertisement. And it was the intelligence's understanding from, I guess, a conversation that I had previously had from them — or with them in which Thai was not allowed to have — I understood that Thai was not allowed to have outside promoters. So, they sent me this Internet ad that they found.

> *    *    *

> [W]e were able to establish that the person who had the Internet flyer posted on their Facebook page was a Mr. Mark Twain Green. Eventually we were able to establish the name of Mark Twain Green. In any case, Twain Green, from the information I received from intelligence, had some connection or there appeared to be some connection between him and 27 Entertainment, which is one of the promoters that is listed on the flyer. The flyer was powered by Boss Entertainment, Everyday Entertainment and 27 Entertainment. Mr. Twain Green is known as a local music promoter.

The advertisements were introduced into evidence, and Thai Palace did not rebut Officer Thompson's testimony. The officer also testified that she observed printed flyers in Thai Palace during the time that the second consent order was in effect. The flyers advertised musical performances and other live entertainment at Thai Palace and included text that indicated the use of promoters: "This event is brought to you by On Fire Productions/J&J Productions/Kenya White Productions! Smitty Productions/R.E.D.

15

Productions/Swagg Entertainment" "Corporate Affairs Presents," "No Question Band Ent Presents," and "Through Rock Promotions." Mrs. Thana testified that she made the decisions regarding what entertainment was offered at the restaurant and approved the flyers, even though the flyers were drafted by individuals not employed by Thai Palace.

Thai Palace challenges the Board's reliance on these flyers and Internet advertisements of events. Specifically, the licensee argues that the Board had evidence through Mrs. Thana's testimony that "she [made] all of the decisions regarding entertainment at Thai Palace, and that she was involved in the selection process and approved or declined to approve each flyer and/or advertisement, and otherwise maintained control of the entertainment at Thai Palace."

Nonetheless, the second consent order broadly prohibits third parties from exercising control over the entertainment advertising and presentation at Thai Palace. The Board received testimony of witnesses who reported that they observed go-go entertainment at Thai Palace on multiple occasions, in contradiction to Mrs. Thana's insistence that go-go music was not performed. From this testimony, the Board was allowed to draw an inference that Mrs. Thana's testimony was not credible and that Thai Palace was not in control of the entertainment. The clear implication of the content of the advertisements—which used language such as "This event is brought to you by [third party promoter]"—was that some third party was promoting and supplying the entertainment at Thai Palace. The Board was not required to disregard this evidence and instead credit Mrs. Thana's contrary testimony. Finally, the advertisements and Mrs. Thana stated that patrons could book "VIP" tables by calling the bands or promoters. In

16

our view, a reasoning mind could have concluded that the licensee had violated the consent order's prohibition on the use of promoters. Thus, we hold that substantial evidence supported the decision of the Board and, therefore, affirm the circuit court on this issue.

### III.    Constitutional Issues

Thai Palace also contends that the restriction on go-go entertainment violates the First Amendment.[8]  The Board's response is two-fold.  First, the Board argues that Thai Palace may not argue this constitutional claim because it was not raised at the hearing before the Board.  Second, the Board contends that Thai Palace waived any constitutional challenge to the language in the second consent order when it proposed and consented to the order and did not seek immediate judicial review of the terms of the agreement.

Generally, a government cannot condition a benefit on a basis that infringes constitutionally protected interests, "especially [one's] interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  The Supreme Court has routinely invalidated conditions that restricted individual rights generally and First Amendment rights in particular.  *See, e.g., Perry*, 408 U.S. at 597-98 (holding that employment at a public university may not be predicated on the university's disagreement with the employee's exercise of First and Fourteenth Amendment rights).  Although the Board

---

[8] In a footnote, Thai Palace argues for the first time that the second consent order's restriction on using promoters violates its First Amendment right of association.  Thai Palace provides no argument and cites to no authority in support of this unpreserved contention.  Therefore, we will not consider it.

and the licensee may consent to reasonable restrictions, the Court of Appeals has not resolved whether "the [liquor board] may use its power to grant or transfer a license to try to coerce the acceptance of restrictions by the prospective licensee or [whether] all restrictions agreed to by licensees are valid." *Bd. of Liquor License Com'rs for Baltimore City v. Fells Point Café, Inc.*, 344 Md. 120, 141 (1996). The present context concerns the grant of a benefit—the liquor license—and involves a government body as a party to the consent agreement—a situation that requires consideration of interests not present in agreements between private parties.[9]

---

[9] In their article, *Rethinking Free Speech and Civil Liability*, Daniel J. Solove and Neil M. Richards note:

> At the doctrinal level, the consensual waiver [of constitutional rights] approach's focus on autonomy fails to explain the problem of unconstitutional conditions. For instance, suppose the government offered to pay citizens $100 in exchange for not criticizing government policies. From a pure autonomy approach, those who accepted such a deal would have freely bargained away their First Amendment rights to criticize the government. But from the perspective of the social interest in free speech, a valuable source of potential criticism of the government would have been bought up by the government in such a way as to skew, distort, and stifle public discourse. Recognizing this problem, the Supreme Court has held in a series of cases that the government may not condition certain waivers of constitutional rights on the receipt of benefits. The unconstitutional conditions doctrine has been criticized for being inconsistent and incoherent, but it clearly reflects that even "consensual" waivers of constitutional rights can threaten the First Amendment and trigger heightened scrutiny.

109 Colum. L. Rev. 1650, 1678 (2009); *see also* Jason Mazzone, *The Waiver Paradox*, 97 Northwestern U. L. Rev. 801, 848 (2003) (contrasting the Supreme Court's willingness to allow waiver of constitutional rights in the criminal plea bargain context with the Court's skepticism of governmental conditions on the exercise of First Amendment rights).

Music and live musical entertainment fall within the "wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment"). Thus, a restriction on a specific type of music is, on its face, a content-based restriction on First Amendment expression and presumptively unconstitutional. *See Torries v. Hebert*, 111 F. Supp. 2d 806, 818-19 (W.D. La. 2000) (holding that prosecution of a skating rink for contributing to the delinquency of a minor by playing "gangster rap" was content-based discrimination violative of the First Amendment); *see also DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266 (11th Cir. 2007) (suggesting that laws that "distinguish, for example, between excessively loud singing, thunderous classical music recordings, reverberating bass beats" would be considered content-based).

Conditioning liquor licenses on an agreement with a putative licensee that it refrain from playing a particular type of music or, more generally, suggesting to potential licensees that they should forbear from certain forms of expressive conduct in exchange for a license may be unconstitutional. *See, e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994) (holding an agreement conditioning a liquor license on a restriction on topless dancing was unenforceable under the unconstitutional conditions doctrine). Alternatively, an agreement may avoid First Amendment challenge by focusing on content-neutral conditions, such as time, place, and manner restrictions, which have consistently been held to withstand intermediate judicial

19

scrutiny. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 803 (1989); *Piscatelli v. Bd. of Liquor License Com'rs*, 378 Md. 623, 643 (2003). In conditioning licenses on content-neutral bases such as requirements to provide extra police or security during live entertainment events, restrictions on decibel level, and limitations on attendance or crowd-size, liquor boards would not run afoul of the First Amendment.[10]

For example in *BEG Investments, LLC v. Alberti*, 85 F. Supp. 3d 13 (D.D.C. 2015), when faced with incidents of violence in areas surrounding a nightclub that featured mostly R&B, Hip-Hop, and go-go music—a situation reminiscent of Thai Palace in 2008—the D.C. Alcohol Beverage Control Board imposed content-neutral conditions that withstood court scrutiny. The board in that case conditioned the renewal of the night club's liquor license on the requirement that the night club hire a Metropolitan Police Department reimbursable detail "whenever the establishment provides any DJs or live music as entertainment at the establishment."[11] *Id.* at 20. The nightclub challenged the restriction as content-based; however, the district court determined that:

> the condition itself does not reflect[] that the Board imposed any restrictions whatsoever on the content or genre of music that Plaintiff may play while maintaining its liquor license. According to the Board's order, Plaintiff was required to hire a reimbursable detail only if it elected to provide certain forms of live entertainment—a DJ or live music— regardless of whether the music played was go-go or gospel.

---

[10] Unquestioned in this case is a liquor board's authority to prevent a licensee from offering live musical entertainment.

[11] A reimbursable detail comprises "MPD officers [who] patrol the surrounding area of an establishment for the purpose of maintaining public safety." *BEG Investments*, 85 F. Supp. 3d at 20.

*Id.* at 36. Furthermore, the Alcohol Beverage Control Board's explanation for its imposition of the condition was content-neutral—it was designed to alleviate "negative impacts on the neighborhood" and was in response to "concerns regarding the establishment's effect on peace, order, and quiet" after "a number of violent incidents . . . [had] occurred at the establishment." *Id.* The court held that there was "no question that the reimbursable detail condition is facially content-neutral, impacting indirectly only the 'time, place or manner of expression,' purportedly for the purpose of ameliorating the establishment's negative effects on the surrounding neighborhood." *Id.*

As shown by these cases, it may be risky for a liquor board to adopt, as an affirmative policy, restrictions on certain forms of dancing or musical entertainment. However, the First Amendment issue has been waived and is not preserved for our review.

"Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8-131(a). This proposition holds for appeals from administrative agencies, such as the Board, *Motor Vehicle Admin. v. Shepard*, 399 Md. 241, 260 (2007) (It is a settled principle of Maryland administrative law that, in an action for judicial review of an adjudicatory administrative agency decision, the reviewing courts should decline to consider 'an issue not raised before the agency), and applies to equally constitutional issues where the litigant is not challenging the constitutionality of statute in its entirety, *Yim, LLC v. Tuzeer*, 211 Md. App. 1, 49 (2013) (Citations omitted) ("[E]ven

21

constitutional issues 'must be pursued and exhausted' before the relevant administrative agency 'before resort[ing] to the courts'"); *Ins. Com'r of State of Md. v. Equitable Life Assur. Soc. of U.S.*, 339 Md. 596, 622 (1995).

Thai Palace does not argue that it raised any constitutional issues during the Board's enforcement proceeding. It does, however, contend that by raising due process and equal protection defenses before the circuit court, it preserved its First Amendment arguments for review in this Court. We disagree—Thai Palace would have had to raise these claims before the Board to preserve them for our review. *Pelham Wood Apartments*, 283 Md. at 518; *Yim, LLC*, 211 Md. App. at 49. Moreover, even if we were to acknowledge Appellants' arguments in the circuit court, we would not construe its due process and equal protection claims—each with legal standards that differ from a First Amendment analysis—to be enough to preserve a First Amendment claim made for the first time on appeal to this Court.[12] We conclude that Thai Palace failed to preserve its First Amendment argument.

Moreover, licensee is precluded from challenging the terms of the consent order because the licensee proposed the contested terms and because it failed to appeal the allegedly unconstitutional condition at the time it was included in the court order. *Fells Point Café*, 344 Md. at 141 (holding that "when a licensee agrees to reasonable

---

[12] Thai Palace argued before the circuit court that, "One, [the consent order] was discriminatory as opposed to all types of music. And, two, that as, as to go-go music, it failed on the due process ground because there was no ascertainable standard for inclusion or exclusion, and was therefore unconstitutionally vague." The licensee is no longer pursuing these due process and equal protection arguments before this Court.

restrictions in order to obtain a license that clearly would not otherwise be granted, the licensee will be estopped from later arguing that the Board had no power to place such a restriction on the license"). Although Thai Palace argues that the Board would not modify its liquor license unless it agreed to the restriction on go-go entertainment, the record does not reveal any statements made by the Board on this point, and the document containing these restrictions was submitted by the licensee's attorney. Further, the record reflects that the licensee did not appeal the legality of the second consent order after it was issued. *See Fells Point Café*, 344 Md. at 137 ("If a licensee feels aggrieved by the conditions sought to be placed on his or her license, he or she should seek judicial review at the time the conditions are imposed").

In the instant case, where the licensee proposed the restrictions and did not seek judicial review until after enforcement, and where the licensee did not raise this issue before the Board or before the circuit court, we will not decide the First Amendment question. For the above reasons, we affirm the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**