**PUBLIC SAFETY**

CARBON MONOXIDE ALARMS – WHETHER CARBON MONOXIDE
    ALARMS MUST BE INSTALLED IN ALL RENTAL DWELLING
    UNITS

August 1, 2019

*The Honorable D. Robert Meffley*
*President, County Council of Cecil County*

Your predecessor as the President of the Cecil County Council asked for our opinion about the applicability of Title 12, Subtitle 11 of the Public Safety Article, as amended by Chapters 174 and 175 of 2016, to certain rental dwelling units. Specifically, your predecessor asked whether the subtitle's provisions requiring the installation of carbon monoxide alarms apply to rental dwelling units that do not rely on the carbon-monoxide-producing combustion of a fossil fuel for heat, ventilation, hot water, or clothes dryer operation—that is, units that rely solely on electricity, which does not emit carbon monoxide.[1] The Cecil County Attorney has given advice that Chapter 175 applies to all rental dwelling units, regardless of whether they rely on appliances that operate by combustion. For the reasons explained below, we agree. It is our opinion that the statute, as amended in 2016, applies to all rental dwelling units, including those that run entirely on electricity.

**I**

**Background**

Carbon monoxide is an odorless, tasteless, invisible gas that results from the incomplete combustion of wood or fossil fuels, such as kerosene, gasoline, charcoal, propane, natural gas, and oil.[2] The gas can be produced by any appliance that burns those types of fuels, including generators, space heaters, ovens, clothes dryers, automobiles, fireplaces, and grills. Fiscal & Policy Note, H.B. 849, 2016 Leg., Reg. Sess. Furnaces and water heaters are also potential

---

[1] Chapters 174 and 175 of 2016 were enacted by the passage of House Bill 849 and Senate Bill 182, respectively. For brevity, we will refer only to Chapter 175. Also for brevity, we will refer to rental dwelling units that do not have appliances that rely on the combustion of fossil fuel as "all-electric" units.

[2] Consumer Product Safety Comm'n Fact Sheet, https://www.cpsc.gov/safety-education/safety-guides/carbon-monoxide/carbon-monoxide-fact-sheet.

sources of the gas.  *Id.*  Carbon monoxide is a leading cause of unintentional poisoning deaths in the United States.  Maryland Department of Health & Mental Hygiene Position Paper on House Bill 849 ("DHMH Position Paper") (citing Centers for Disease Control and Prevention ("CDC"), *Unintentional Non-Fire-Related Carbon Monoxide Exposures - United States, 2000-2009*, 60(30) Morbidity and Mortality Weekly Report 1014-17 (Aug. 5, 2011)).[3] The CDC has found, for example, that at least 430 people die each year in the United States from unintentional carbon monoxide poisoning.  CDC, Carbon Monoxide (CO) Poisoning Prevention, https://www.cdc.gov/features/copoisoning/index.html (last visited July 24, 2019).  Similarly, from 2008 to 2012, the Maryland Environmental Public Health Tracking System identified more than 2,217 emergency department visits and 186 hospitalizations due to carbon monoxide exposures in Maryland.  DHMH Position Paper. Because of the large number of such incidents, the Consumer Product Safety Commission ("CPSC") recommends that every home have a carbon monoxide alarm on each level and in the hallway near bedrooms in each separate sleeping area.  CPSC, Carbon Monoxide Toolkit, https://www.cpsc.gov/safety-education/ neighborhood-safety-network/toolkits/carbon-monoxide-invisible-killer (last visited July 24, 2019).

Since January 1, 2008, Maryland law has required carbon monoxide alarms in all dwellings for which a building permit was issued on or after that date if the dwelling "relies on the combustion of a fossil fuel for heat, ventilation, hot water, or clothes dryer operation."  2007 Md. Laws, ch. 401.  In recent years, the General Assembly has amended the law to broaden the scope of the alarm requirements as applied to hotels, lodging or rooming houses, and rental dwelling units.  For example, the law was amended in 2015 to require carbon monoxide alarms in each guest room in a hotel or a lodging or rooming house that contains (or is near) a device that emits carbon monoxide or that is near (or connected by ductwork to) an enclosed unventilated garage, regardless of the date the building was built or permitted.  *See* 2015 Md. Laws, ch. 151. Then, the General Assembly further expanded the law in 2016 to cover all "rental dwelling unit[s]," regardless of when the building was constructed or when permits for the building were issued. 2016 Md. Laws, ch. 175 (effective April 1, 2008).

Thus, as initially enacted, the statute required carbon monoxide alarms to be installed only in dwellings that were newly

---

[3] Available at https://www.cdc.gov/mmwr/preview/mmwrhtml/ mm6030a2.htm.

constructed or had a building permit issued on or after January 1, 2008, and that relied on the combustion of a fossil fuel for heat, ventilation, hot water, or clothes dryer operation. *See* 2007 Md. Laws, ch. 401. Subsequent enactments, however, have created separate rules that govern two special categories of dwellings: (1) hotels and lodging and rooming houses, *see* Md. Code Ann., Pub. Safety ("PS") §§ 12-1102(2), 12-1104(b), and (2) rental dwelling units, *see* PS §§ 12-1102(2), 12-1104(c).

As amended in 2016, the subtitle now applies to:

> (1) a dwelling that:
>
> (i) relies on the combustion of a fossil fuel for heat, ventilation, hot water, or clothes dryer operation; and
>
> (ii) is a newly constructed dwelling for which a building permit is issued on or after January 1, 2008; or
>
> (2) a hotel, a lodging or rooming house, or a rental dwelling unit.

PS § 12-1102.[4] For those dwellings to which the subtitle applies, the statute then provides in relevant part:

> (a) Except as provided in subsections (b) and (c) of this section, there must be a carbon monoxide alarm installed in a central location outside of each sleeping area within a dwelling subject to this subtitle.
>
> (b) For a hotel or a lodging or rooming house, on or after April 1, 2017, there must be a carbon monoxide alarm installed within the

---

[4] The term "rental dwelling unit" is defined by reference to a provision in the Environment Article, *see* PS § 12-1101(g), which in turn defines the term as "a room or group of rooms that form a single independent habitable rental unit for permanent occupation by one or more individuals that has living facilities with permanent provisions for living, sleeping, eating, cooking, and sanitation." Md. Code Ann., Envir. § 6-801(t). The term does not include "(i) an area not used for living, sleeping, eating, cooking or sanitation, such as an unfinished basement; (ii) a unit within a hotel, motel, or similar seasonal or transient facility; (iii) an area which is secured and inaccessible to occupants; or (iv) a unit which is not offered for rent." *Id.*

dwelling [in certain specified places near devices that emit carbon monoxide].

(c) For a rental dwelling unit, on or after April 1, 2018, there must be a carbon monoxide alarm installed within the dwelling as follows:

(1) outside and in the immediate vicinity of each separate sleeping area; and

(2) on every level of the unit, including the basement.

PS § 12-1104.

# II

## Analysis

Your predecessor asked whether, under §§ 12-1102 and 12-1104 of the Public Safety Article, carbon monoxide alarms must be installed in all rental dwelling units, including units that do not rely on the combustion of a fossil fuel for heat, ventilation, hot water, or the operation of a clothes dryer. That question is one of statutory interpretation. The cardinal rule of statutory construction is to ascertain and effectuate the intent of the General Assembly, and the starting point for that process is the plain language of the statute in question. *Ingram v. State*, 461 Md. 650, 661 (2018). The meaning of even the plainest language, however, must be read in light of the context in which it appears. *Id*. at 662. Thus, the context of a statute—the titles of, preambles to, and amendments of the bill that added the provision in question, its legislative history, and its relationship to earlier and subsequent legislation—is relevant to "the fundamental issue of legislative purpose" and therefore to the meaning of the legislative language. *Id*. at 663 (quoting *Kaczoroswki v. Baltimore*, 309 Md. 505, 515 (1987)). In this case, the plain meaning of the words of the statute, the statute's structure, and the history and purpose of the 2016 amendments all lead to the same conclusion: Carbon monoxide alarms are required in all rental dwelling units, even if those units are all-electric.

We start with the language of the statute. The text of PS §§ 12-1102 and 12-1104, read together, makes clear that the subtitle's requirements apply to all rental dwelling units, including those that are all-electric. As outlined by § 12-1102, the statute applies separately to (1) a dwelling that "relies on the combustion of a fossil fuel for heat, ventilation, hot water, or clothes dryer operation" and "is a newly constructed dwelling for which a

building permit is issued on or after January 1, 2008 . . . *or* (2) a hotel, a lodging or rooming house, or a rental dwelling unit." PS § 12-1102 (emphasis added). The term "or" is a "disjunctive conjunction which serves to establish a relationship of contrast or opposition." *Hoile v. State*, 404 Md. 591, 609 (2008) (internal quotation marks omitted). In this instance, the term contrasts dwellings that were covered only by the original legislation in 2007 from those types of dwellings (including rental dwelling units) that were specifically given different treatment by subsequent legislation in 2015 and 2016. *See Ingram*, 461 Md. at 665-66 (explaining that the more specific statute is usually an exception to a more general one). Although § 12-1102(1) expressly limits coverage under *that* paragraph to dwellings where fossil fuels are used for heat or to operate appliances, the separate clause in § 12-1102(2) that governs rental dwelling units does not mention reliance on fossil fuels. In other words, the clause in § 12-1102(1) that excludes all-electric dwellings from that category does not modify the separate clause in § 12-1102(2) that governs the applicability of the statute to rental dwelling units.

Similarly, under § 12-1104, there is no limitation on the type of rental dwelling unit to which the statute's requirements apply. Section 12-1104(a) sets the basic requirement for the placement of carbon monoxide alarms in a "dwelling" but makes an exception for dwellings that are covered either by § 12-1104(b), which sets the specific requirements for carbon monoxide alarms in hotels, lodging houses, and rooming houses, or by § 12-1104(c), which sets the specific requirements for placement of carbon monoxide alarms in rental dwelling units. In the subsection that governs hotels and lodging and rooming houses, the General Assembly specifically provided that carbon monoxide detectors need only be installed in guest rooms and other areas that "contain[] a device that emits carbon monoxide," that are "adjacent to" a room or area with such a device, or that are "adjacent to" (or connected by ductwork to) "an enclosed unventilated attached garage." PS § 12-1104(b). By contrast, the subsection that governs rental dwelling units requires carbon monoxide alarms on every level of the dwelling and outside each sleeping area without any reference to appliances that rely on fossil fuels or other possible sources of carbon monoxide. PS § 12-1104(c).

Thus, although the statute's scope as to most types of dwellings depends on whether the dwelling employs carbon-monoxide-producing devices, *see* PS §§ 12-1102(1), 12-1104(b), there is no such limitation in the statute as to rental dwelling units. Where, as here, the General Assembly has "carefully employed" a

limitation in one part of the statute and excluded that same limitation in another, we cannot infer the existence of the limitation where it is excluded. *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223-24 (2003) (internal citation and quotation marks omitted); *see also Miller v. Miller*, 142 Md. App. 239, 251, *aff'd sub nom. Goldberg v. Miller*, 371 Md. 591 (2002) (explaining that when a legislative body "included particular language in one section of a statute, but omitted it in another section of the same act, it could be presumed that [the legislature] acted intentionally and purposely in the disparate inclusion or exclusion"). Based on the plain language of PS §§ 12-1102 and 12-1104, the statute does not limit its application to rental dwelling units with appliances that rely on the carbon-monoxide-producing combustion of fossil fuels.[5]

That conclusion is also strongly supported by the legislative history of Chapter 175. As introduced, both House Bill 849 and Senate Bill 182, which became Chapters 174 and 175, respectively, required placement of carbon monoxide alarms in rental dwelling units based on the location of appliances that rely on fossil fuels. *See, e.g.*, H.B. 849, 2016 Leg., Reg. Sess. (First Reader). As explained by the sponsor, Delegate Sheree Sample-Hughes, this original language had been modeled on Chapter 151 of 2015, which related to hotels and lodging or rooming houses. *See Hearing on House Bill 849 Before the House Env't & Transp. Comm.*, 2016 Leg., Reg. Sess. (Feb. 23, 2016). However, both bills were subsequently amended to change the language to what now appears as PS § 12-1104(c), removing any limitation on the location of carbon monoxide alarms based on the presence of a device that emits carbon monoxide. *See* H.B. 849, 2016 Leg., Reg. Sess. (Third Reader); S.B. 182, 2016 Leg., Reg. Sess. (Third Reader). The fact that the Legislature amended the bills to remove that

---

[5] The only provision that might arguably suggest otherwise is PS § 12-1104(d). That subsection provides that for all dwellings covered by the statute, including rental dwelling units, the owner may satisfy the statute by having "a centralized alarm system that is capable of emitting a distinct and audible sound to warn all occupants" and then installing "a carbon monoxide alarm within 25 feet of any carbon monoxide-producing fixture and equipment." However, in our view, the fact that the statute allows the owner of a rental dwelling unit with carbon-monoxide-producing fixtures to satisfy the statute in an alternative way does not mean that the General Assembly intended to limit the scope of the requirement only to rental dwelling units with such carbon-monoxide-producing fixtures. It just means that the owner of a rental dwelling unit without any such appliances must satisfy the standard requirements under § 12-1104(c) by installing an alarm on each floor and outside each sleeping area.

limitation is strong evidence that the General Assembly did not intend that the alarm requirement for rental dwellings be limited to rental dwellings with carbon-monoxide-producing sources. *See, e.g.*, *Harris v. State*, 331 Md. 137, 152 (1993); *Krauss v. State*, 322 Md. 376, 386-87 (1991).

The context surrounding the enactment of Chapter 175 further reinforces our conclusion. The legislation was enacted, at least in part, in response to a specific tragedy involving a family in Somerset County that had been living in an all-electric rental dwelling. *See, e.g.*, *Hearing on H.B. 849* (written testimony of co-sponsors Del. Sample-Hughes and Del. Holmes). Although that dwelling was all-electric, the family's electricity had been cut off during the winter, and to keep the family warm, the father brought a generator inside. The generator emitted carbon monoxide, and the tragic result was that the entire family—the father and seven children—died of carbon monoxide poisoning. This tragedy was mentioned numerous times during committee hearings and on the floor of the House and Senate, and an evident purpose of the legislation was to prevent similar tragedies in the future. *See, e.g.*, *id.* (written testimony of Delegates Sample-Hughes and Holmes); Senate Proceedings No. 31, 2016 Leg., Reg. Sess. (statement of Sen. Mathias); Senate Proceedings No. 65, 2016 Leg., Reg. Sess. (statement of Sen. Mathias); *see also* DHMH Position Paper.

If the statute were interpreted so as to exclude all-electric rental dwellings from its requirements, the law would not solve the problem that led to the tragedy in Somerset County. That is, the law would not protect families who have heating systems that cannot handle severe cold and seek alternate heating methods,[6] would not protect families during electrical outages following natural disasters,[7] and would not protect families when the

---

[6] The Maryland Department of Health & Mental Hygiene (now the Department of Health) noted in its testimony that rates of carbon monoxide poisoning are highest during the winter months in Maryland. DHMH Position Paper.

[7] DHMH also explained in its testimony that Maryland has experienced outbreaks of carbon monoxide poisoning in homes during natural disasters, such as Hurricane Irene in 2011. DHMH Position Paper; *see also* Shahed Iqbal, et al., *A Review of Disaster-Related Carbon Monoxide Poisoning: Surveillance, Epidemiology, and Opportunities for Prevention*, 102 Am. J. Public Health 1957-63 (2012) (concluding that, for the period studied, most cases of carbon monoxide poisoning occurred within 3 days of a natural disaster and from indoor use of generators and charcoal grills).

occupants use things like portable generators, supplemental heating and cooking equipment, or charcoal grills.[8] Thus, the legislative history supports interpreting the statute to apply to all rental dwelling units, even all-electric units, for the simple reason that the primary event giving rise to the bill (and other events like it) would not have been prevented by a requirement that did not reach all-electric rental dwelling units.[9] In sum, the language of the statute and the legislative history both make clear that its carbon-monoxide-alarm requirements apply to all rental dwelling units, including those that rely solely on electricity.

## III

## Conclusion

For the above reasons, it is our view that Chapter 175 applies to all rental dwelling units, including all-electric dwellings.

> Brian E. Frosh
> Attorney General of Maryland
>
> Kathryn M. Rowe
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice

---

[8] The General Assembly had been urged to consider requiring carbon monoxide alarms in all-electric dwellings when it adopted the original alarm requirement in 2007. During the hearings on that bill, interested parties submitted testimony noting that people in all-electric dwellings were still vulnerable to carbon monoxide poisoning from portable generators, supplemental heating and cooking equipment, and charcoal grills. *See, e.g.*, *Hearing on H.B. 401 Before the House Envt'l Matters Comm.*, 2007 Leg., Reg. Sess. (Feb. 27, 2007) (written testimony of the National Electrical Manufacturers Association); *id.* (written testimony of Gas Appliance Manufacturer Association); *id.* (written testimony of Residential Fire Safety Institute). Ultimately, however, this change was not made, possibly because the state of the bill at the time was the result of long negotiation, and the sponsor was not willing to open it up for more. *See Hearing on S.B. 535 Before the Senate Educ., Health, & Envt'l Affairs Comm.*, 2007 Leg., Reg. Sess. (Mar. 14, 2007).

[9] Maryland is not the only state to require carbon monoxide detectors in at least certain dwellings that do not rely on the combustion of fossil fuels. *See* Michigan Comp. Laws Ann. § 125.1504d and f; Montana Code Ann. § 70-24-303; Oregon Rev. Stat. § 455.360; Vermont Stat. Ann. tit. 9 §§ 2881 to 2883; Virginia Code Ann. § 55-248.18. Moreover, the U.S. Consumer Product Safety Commission recommends that carbon monoxide alarms be installed in all dwellings. *See* CPSC, Carbon Monoxide Toolkit.